UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                              Chapter 7 (Involuntary)
RAND INTERNATIONAL, LLC,                            Case No. 10-71497 (AST)

                         Debtor.
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR ABSTENTION DISMISSING INVOLUNTARY PETITION

Douglas J. Pick
Eric C. Zabicki
**PICK & ZABICKI LLP**
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000
dpick@picklaw.net

*Counsel to the Alleged Debtor*

Dated: May 4, 2010

## TABLE OF CONTENTS

Page No.

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS ................................................................... 2

    A. The Goldmeiers' Sale of Old Rand ................................................... 2

    B. The Goldmeiers' Continued Employment and Involvement With Rand ......... 4

    C. Executive Importers, LLC ............................................................. 7

    D. Dispute Between the Goldmeiers
       and Mark Worksman and Ensuing State Court Litigation .......................... 8

    E. Filing of the Involuntary Petition ..................................................... 12

ARGUMENT ................................................................................. 14

    A. Summary Judgment Standard ......................................................... 14

    B. Summary Judgment Dismissing the Involuntary Petition
       and/or Abstention is Appropriate ..................................................... 17

       1. The Involuntary Petition Was Filed Without
          the Requisite Approval of Rand's Board of Managers .......................... 17

       2. The Involuntary Petition, Filed for the Bad Faith Purpose
          of Addressing a Two-Party Dispute, Should be Dismissed ................... 19

       3. This Court Should Abstain From Exercising
          Jurisdiction Over This Two-Party Dispute ...................................... 22

       4. The Involuntary Petition Should be Dismissed since the Claims
          of the Petitioning Creditors are the subject of Bona Fide Dispute ............ 23

CONCLUSION ............................................................................... 26

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                   **Page No.**

In re Al-Wyn Food Dist., 8 B.R. 42, 43 (Bankr. M.D. Fl. 1980) ................................ 17

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ..................................... 15

Bartmann v. Maverick Tube Corp., 853 F.2d 1540 (10th Cir. 1988) ............................. 15

In re Better Case, Ltd., 97 B.R. 405 (Bankr. S.D. Ill. 1989) ................................ 20, 21

In re Busick, 831 F.2d 745 (7th Cir. 1987) ............................................... 16

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ......................................... 14, 15

In re Compania de Alimentos Fargo, S.A., 376 B.R. 427 (Bankr. S.D.N.Y. 2007) ............. 22

Matter of Fitzgerald Group, 38 B.R. 16 (Bankr. S.D.N.Y. 1983) ............................ 22

In re Focus Media, Inc., 378 F.3d 916 (9th Cir. 2004) .................................... 24

Fraternal Composite Services v. Karczewski,
     2004 U.S. Dist. LEXIS 18888 (N.D.N.Y 2004)............................. 20 [FN 6]

Key Mechanical, Inc v. BDC 56 LLC (In re BDC 56 LLC),
     330 F.3d 111 (2d Cir. 2003) ..................................................... 16, 25

Kulak v. City of New York, 88 F.3d 63 (2d Cir. 1996) ..................................... 15

Liberty Tool & Mfg. v. Vortex Fishing Systems, Inc.
     (In re Vortex Fishing Systems, Inc.), 277 F.3d 1057 (9th Cir. 2001) .................... 16

In re Lough, 57 B.R. 993 (Bankr. E.D. Mich. 1986) ...................................... 16

Lubow Machine Co., Inc. v. Bayshore Wire Products Corp.
     (In re Bayshore Wire Products Corp.), 209 F.3d 100 (2d Cir. 2000) .................... 19, 20

In re Mavella, 149 B.R. 301 (Bankr. E.D.N.Y.1991) ...................................... 16

Metz v. Dilley (In re Dilley), 339 B.R. 1 (B.A.P. 1st Cir. 2006) .......................... 16

In re Monitor Single Lift I, Ltd., 381 B.R. 455 (Bankr. S.D.N.Y. 2008) .................... 22, 23

In re Mountain Dairies, Inc., 372 B.R., 623 (Bankr. S.D.N.Y. 2007) .................... 15, 23, 24

**Federal Cases (Continued)**                                                    **Page No.**

In re Palace Oriental Rugs, Inc., 193 B.R. 126 (Bankr. D. Conn. 1996) ......................... 24

In re Paper I Partners, L.P., 283 B.R. 661 (Bankr. S.D.N.Y. 2002) ........................…. 23

Platinum Financial Services Corp. v. Byrd,
   (In re Byrd), 357 F.3d 433 (4th Cir. 2004) ............................................................ 25

Regal Cleaners & Dyers, Inc. v. Merlis, 274 F. 915 (2nd Cir. 1921) ......................…. 17, 18

In re Source Enterprise, Inc., 392 B.R. 541 (S.D.N.Y. 2008) ......................…....….. 17

In re Stavola/Manson Electric Co., 94 B.R. 21 (Bankr. D. Conn. 1988) ...........…............ 18

**Federal Statutes and Rules**

11 U.S.C. §101(31) ......................................................................................... 1

11 U.S.C. §303(b) ...................................................................…... 23, 24

11 U.S.C. §305(a)(1) .......................................................................…... 1, 22, 23

Fed. R. Civ. P. 56 ...............................................................................…... 1, 14

Fed. R. Bankr. P. 7056 ............................................................................…... 1, 14

**Secondary Sources**

2 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy*
P 303.03[2][b] (15th rev. ed. 2006) ................................................................. 25

## PRELIMINARY STATEMENT

Rand International Leisure Products, LLC (incorrectly named in this proceeding as Rand International, LLC), the alleged debtor herein ("Rand"), by and through its undersigned counsel, respectfully submits this memorandum of law in support of its motion (the "Motion") for entry of an Order, pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), incorporating by reference Rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules"), granting summary judgment in its favor dismissing the involuntary petition (the "Involuntary Petition") filed against Rand by the petitioning creditors herein (collectively, the "Petitioning Creditors") or, alternatively, for abstention pursuant to §305(a)(1) of title 11 of the United States Code (the "Bankruptcy Code").

As more fully discussed herein, and as evidenced by the accompanying affidavits of Rand's President and Chief Executive Officer, Mark Worksman and the exhibits annexed thereto (the "Worksman Aff."); Stephan Pinsly, Managing Director with Getzler, Henrich & Associates, LLC (the "Pinsley Aff.."); Sean Smith, a Consultant with Getzler, Henrich & Associates, LLC (the "Smith Aff."); and the declaration of James B, Zane, Esq. (the "Zane Decl."), the Involuntary Petition must be dismissed because: (a) Petitioning Creditors Allen Goldmeier and Steven Goldmeier (together, the "Goldmeiers") are "insiders" of Rand, within the meaning of §101(31) of the Bankruptcy Code, who did not seek or obtain the requisite corporate approval of Rand's Board of Managers (the "Board") (on which Allen Goldmeier sits) prior to filing the Involuntary Petition; (b) the Involuntary Petition was filed in bad faith to frustrate the State Court Action (as hereinafter defined) relating to a bitterly contentious two-party struggle over the control of Rand as between the Goldmeiers and Mark Worksman, which dispute was otherwise proceeding efficiently in the State Court Action; and (c) each of the respective claims of the

1

Petitioning Creditors is subject to a bona fide dispute as to the amount of such claim and/or liability of Rand in connection therewith.

## STATEMENT OF FACTS

### A.    The Goldmeiers' Sale of Old Rand

Pursuant to an *Asset Purchase Agreement* executed on or about April 23, 2007 (the "APA"), Rand International Leisure Products, Ltd. ("Old Rand") sold substantially all of its assets (together with substantially all of the assets of Ross Bicycles U.S.A., Ltd., A to Z Freight Forwarders Inc. and North America Cycles Ltd.) (collectively the "Sellers") to Rand International Acquisition I LLC (the "Rand Sale"). Worksman Aff., ¶7; Ex. B (APA). Old Rand was and continues to be owned by the Goldmeiers and Rand International Acquisition I LLC was and continues to be owned by Mark Worksman. Worksman Aff., ¶3. Immediately following the Rand Sale, Old Rand (*i.e.*, Rand International Leisure Products, Ltd.) changed its name to Century Sports, Inc. ("Century Sports"). Worksman Aff., ¶4. Rand International Acquisition I LLC thereafter changed its name to Rand International Leisure Products LLC and is the alleged debtor herein. Id.

Pursuant to the APA, the purchase price for Old Rand consisted of: (a) $6,912,000 in cash; (b) an *Eight (8%) Percent Senior Subordinated Secured Note* (the "Subordinated Note") in the amount of $3,000,000 in favor of Old Rand; and (c) the assumption of all "Liabilities": (i) arising under all "Assumed Contracts", (ii) of all "Employee Benefit Plans" and (ii) "relating to each Seller's Business". Worksman Aff., ¶8; Ex. B (APA), Sec. 2.5; Ex. D (Subordinated Note). As collateral for the repayment of the amounts owed by Rand under the Subordinated Note, the parties entered into a *Security Agreement* dated as of April 23, 2007 pursuant to which Old Rand was granted a lien (which, as more fully discussed below, was subsequently subordinated to a

2

first lien held by Wells Fargo Bank) in all of Rand's then-existing and after-acquired assets. Worksman Aff., ¶8; Ex. D (Subordinated Note). Simultaneously, Mark Worksman executed a *Personal Guaranty* and a *Power of Attorney* in favor of Old Rand, and his membership interests in Rand were placed in escrow pursuant to a *Pledge and Escrow Agreement* each dated April 23, 2007. Worksman Aff., ¶8.

To finance the acquisition of the Sellers' assets, Rand, with assistance from the Goldmeiers, obtained two loans from Wells Fargo Bank pursuant to a credit and security agreement between Rand and Wells Fargo dated April 23, 2007 (the "Wells Fargo Credit Agreement"). Worksman Aff., ¶9. One of the loans consisted of a revolving credit line for up to the principal amount of $10,000,000 (the "Wells Fargo Revolving Note") which Rand used a substantial portion of to fund the $6,912,000.00 cash portion of the purchase price. Id. The second loan consisted of a term note for the principal amount of $2,000,000 (the "Wells Fargo Term Note") which Rand utilized for working capital. Id. Rand repaid the amounts owed under the Wells Fargo Term Note in monthly installments of $55,555.99 each beginning on or about May 1, 2007. Id. Pursuant to the Wells Fargo Credit Agreement, Rand granted Wells Fargo Bank a lien on and security interest in all of its then-existing and after-acquired assets. Id.

On or about April 23, 2007, Old Rand executed a *Subordination Agreement* (the "Subordination Agreement") pursuant to which it agreed to subordinate its security interest in Rand's assets to Wells Fargo and further agreed to defer repayment of principal and to accept interest-only payments on the Subordinated Note until Rand satisfied the Wells Fargo Term Note. Worksman Aff., ¶10; Ex. E (Subordination Agreement).

**B.    The Goldmeiers' Continued Employment and Involvement With Rand**

The APA additionally contains a "Non Competition; Non Solicitation" covenant precluding the Goldmeiers from directly or indirectly owning, managing, operating, controlling or participating in any competing business with Rand for a period of five (5) years (the "Non-Compete Clause"). Worksman Aff., ¶11; Ex. B (APA), Sec. 5.15. In addition to the foregoing, each of the Goldmeiers' Employment Agreements (as hereinafter defined) contains substantially identical non-competition/non-solicitation provisions to those in the APA, but which run for a period of five (5) years "after the expiration of the Term" of the Employment Agreements, *i.e.*, three years from the execution thereof. Worksman Aff., ¶11; Ex. F (Employment Agreements), Sec. 7(b). Presumably concerned with the significant ramifications of the Non-Competition Clause, the Goldmeiers insisted upon maintaining active participation in the future management and operations of Rand.

Thus, in conjunction with the Rand Sale, each of the Goldmeiers negotiated an *Employment Agreement* with Rand (collectively, the "Employment Agreements"). Worksman Aff., ¶13; Ex. F (Employment Agreements), Sec. 6(e). The Employment Agreements provide each of the Goldmeiers with, *inter alia*, a right to receive payment from Rand equal to fifteen (15%) percent (for a total of 30%)[1] of the "Stated Value" of Rand, payable upon the occurrence of a "Capital Event" or a "Change in Control", as those terms are defined in the Employment Agreements. Worksman Aff., ¶13; Ex. F (Employment Agreements), Sec. 6. Curiously, the Employment Agreements define the Goldmeiers' financial interest as a "Phantom Equity Interest" in Rand. Id. In order for the Goldmeiers to maintain control over Rand, its management and

---

[1]    As discussed more fully herein, by written Agreement dated August 25, 2009, drafted by Allen Goldmeier, the Goldmeiers loaned Rand the sum of $500,000 in exchange for which the Goldmeiers increased their equity interest in the stated value of Rand from 30% to 40%. Worksman Aff., ¶19; Ex. H (August 25, 2009 Loan Agreement).

operations, the Employment Agreements expressly preclude Rand from making any distributions to the "members" of Rand (consisting solely of Mr. Worksman) without first obtaining permission from the Goldmeiers.  Worksman Aff., ¶13; Ex. F (Employment Agreements), Sec. 6(e).

In addition, on or about April 23, 2007 and in conjunction with the Rand Sale, the Goldmeiers negotiated and executed a *Voting Agreement* (the "Voting Agreement").  Worksman Aff., ¶14; Ex. G (Voting Agreement).  According to the Voting Agreement, the Goldmeiers were authorized, among other things, to exercise control over Rand's business decisions and were granted access to all financial information, including the right to receive all notices of any meeting of the Board.  Worksman Aff., ¶14.  The Goldmeiers, moreover, were authorized, pursuant to the terms of the Voting Agreement, to appoint Steven Goldmeier or Allen Goldmeier to the Board.  Id.  As expressly stated in the verified complaint signed by Allen Goldmeier on or about January 18, 2010 (the "Verified Complaint") filed in the State Court Action:

> The Voting Agreement was intended to ensure that the Goldmeiers would have the opportunity, through their designee to Rand's Board of Managers, to participate in the process of making important and critical decisions concerning Rand's business activities and to have access to financial information concerning Rand and its dealings with Wells Fargo, critical suppliers and other trade creditors, as well as all facets of the ongoing business activities.

Worksman Aff., Ex.K (Verified Complaint), ¶45.

Consistent with the Voting Agreement, and pursuant to Rand's *Operating Agreement* dated as of April 23, 2007[2] (the "Operating Agreement"), Rand would be managed by a two-member Board consisting of Mark Worksman and Allen Goldmeier.  Worksman Aff., ¶5; Ex. A (Operating Agreement), ¶6(a).  The Operating Agreement further provides, in pertinent part, as

---

[2] The Operating Agreement expressly provides that it "shall be governed by, and construed under, the laws of the State of New York, all rights and remedies being governed by said laws."  Worksman Aff., Ex A (Operating Agreement), ¶16 therein.

follows:

> Mark Worksman shall have two (2) votes with respect to any matters that come before the Board.  Allen Goldmeier shall have one (1) vote with respect to any matters that come before the Board.
> \* \* \*
>
> At all meetings of the Board, the Managers having a majority of the votes shall constitute a quorum for the transaction of business and, unless otherwise set forth herein, the vote of a majority of the Managers entitled to vote at any meeting at which there is a quorum shall be the act of the Board.

Worksman Aff., ¶5; Ex. A (Operating Agreement), ¶6(a) and (e).  The Operating

Agreement further provides as follows:

> The Board shall be empowered to appoint officers (the "Officers") who may be responsible for all day-today operations of the Company, subject to the supervision of the Board and the terms and conditions of this Agreement and any employment agreement with such Officers.

Worksman Aff., ¶6; Ex. A (Operating Agreement), ¶6(f).  The Operating Agreement

additionally specifies that the following individuals shall serve as the officers of Rand:

> (a) Mark Worksman - President and Chief Executive Officer;
> (b) Allen Goldmeier - Executive Vice-President; and
> (c) Steven Goldmeier - Executive Vice-President.

Worksman Aff., ¶6; Ex. A (Operating Agreement), ¶6(f).  *Allen Goldmeier remains a member of the Board as of the date hereof.*  Worksman Aff., ¶6.

Pursuant to the Verified Complaint, the Goldmeiers misleadingly represented that their "role at Rand was limited to overseeing Rand's marketing and sales activities" (Worksman Aff., Ex. K (Verified Complaint), ¶48) and that "the day to day business decisions for Rand were made by Worksman..." Worksman Aff. Ex. K (Verified Complaint), ¶49.

In August, 2009, and in order to secure a license with Marvel which the Goldmeiers had negotiated, the Goldmeiers agreed to advance $500,000 to Marvel on Rand's behalf (the

6

"Goldmeier Loan") which was memorialized in an agreement between the Goldmeiers and Mr.
Worksman dated as of August 25, 2009. Worksman Aff. ¶19; Ex. H (August 25, 2009 Loan
Agreement). The Goldmeier Loan provides, among other things, as follows:

> (a)    Rand was to repay the loan in two installments of $250,000 to be paid on
> October 25, 2009 and November 25, 2009 "at 12% interest;"
>
> (b)    "The Goldmeiers equity in Rand will revise from 30% to 40%;"
>
> (c)    "Rand stops utilizing and paying for any services of Jonathan Cohen as of
> two weeks from the date of this Agreement"; and
>
> (d)    The Company must "begin operating via the Board of Director approach
> as already agreed in the Buy/Sell."

Worksman Aff. ¶19; Ex. H (August 25, 2009 Loan Agreement).

## C.    Executive Importers, LLC

The Goldmeiers are the owners of Executive Importers, LLC ("Executive Importers"), a
Petitioning Creditor herein. Worksman Aff., ¶15. Executive Importers owns the real property
and improvements located at 51 Executive Boulevard, Farmingdale, New York (the "Premises"),
where Rand's business and assets are located. Id. There is no written lease between Executive
Importers and Rand. Id.

In an effort to force Rand to terminate operations and to compel Mr. Worksman to
surrender management of Rand to the Goldmeiers, the Goldmeiers initially caused Executive
Importers to file a landlord-tenant action (the "Landlord-Tenant Action") against Rand in Nassau
County. The Landlord-Tenant Action was based upon a purported "oral" lease agreement
between Rand and Executive made "on or about February, 2007". Worksman Aff., ¶33; Ex. N
(Eviction Petition). The Landlord-Tenant Action was preliminarily dismissed as a having been
filed in the wrong county. It was, thereafter, re-filed in Suffolk County, but was ultimately
dismissed by the Honorable Stephan L. Ukeiley as a violation of the automatic bankruptcy stay

codified in §362(a) of the Bankruptcy Code.

**D.      Dispute Between the Goldmeiers and Mark Worksman
         and Ensuing State Court Litigation**

By letter dated October 23, 2009 (the "October 23, 2009 Letter"), the Goldmeiers and

Century Sports, by their counsel, advised Rand and Mr. Worksman that, among other things, the

Goldmeiers had accelerated the maturity of the Subordinated Note and all other amounts

allegedly owed to them and demanded payment in full of all such indebtedness.  Worksman Aff.,

¶21; Ex. J (October 23, 2009 Letter).  The October 23, 2009 Letter further advised that "[a]s a

result of the occurrence of Events of Default....Rand [International Leisure Products Ltd.] hereby

elects to exercise all of its rights, powers and remedies under the POA [*i.e.*, power of attorney]

and the other Loan Documents by, among other things, *assuming the immediate assumption of its*

*right to manage and operate the Company.*" (emphasis added).  Id.  In response, Rand denied

occurrence of any "Event of Default" in connection with the Subordinated Note.  Worksman Aff.,

¶21 .

After issuance of the October 23, 2007 Letter, the Goldmeiers had multiple unsuccessful

meetings with Mr. Worksman, as set forth in the Goldmeier Verified Complaint:

> Despite over ten (10) meetings with Worksman, his counsel and the
> consultant (referring to Stephan Pinsly), Rand has not and will not provide
> a workable solution to the Goldmeiers..."

Worksman Aff., ¶21 [FN 3].  When negotiations with Mr. Worksman failed, the Goldmeiers

commenced the State Court Action in an attempt to seize assets and take control of Rand.  As

discussed below, the results of that decision were utterly disappointing, and, accordingly, the

Goldmeiers filed the Involuntary Petition ten days prior to a preliminary conference scheduled in

connection with the State Court Action.

On January 19, 2010, counsel to the Goldmeiers gave notice of presentment of an order

to show cause for a temporary restraining order (the "Order to Show Cause") and other

provisional relief in the New York State Supreme Court located in Mineola. On January 20,

2010, the Goldmeiers and Century Sports commenced an action against Rand and Mr. Worksman

in the Supreme Court of the State of New York, County of Nassau, captioned *Allen Goldmeier,*

*Steven Goldmeier and Century Sports, Inc. f/k/a Rand International Leisure Products, Ltd. v.*

*Mark Worksman and Rand International Leisure Products, LLC f/k/a Rand International*

*Acquisition I, LLC, and Meltzer, Lippe, Goldstein & Breitstone, LLP,* Index No. 1315/2010 (the

"State Court Action"). Worksman Aff., ¶22; Ex. K (Verified Complaint). Pursuant to the State

Court Action, the Goldmeiers and Century Sports sought, among other relief, a temporary

restraining order directing the delivery and turnover to Century Sports of Mr. Worksman's 100%

membership interest in Rand, an order of seizure of the assets of Rand, money judgments against

Rand and Mr. Worksman and an order precluding Rand and/or Mr. Worksman from taking any

steps to assign, sell and/or transfer any of the collateral securing the Subordinated Note held by

Century Sports. Worksman Aff. ¶22; Ex. K (Verified Complaint).

In support of the relief requested, Plaintiffs alleged, among other things, that:

(a)     subsequent to the sale, and in violation of the Voting Agreement, Mr. Worksman excluded the Goldmeiers from financial involvement in Rand's business and limited their involvement to overseeing Rand's marketing and sales;

(b)     Rand hired a Chief Financial Officer named Jon Cohen, and a consultant named Stephan Pinsly[3] to assist in the preparation of Rand's cash flow report, allegedly over the Goldmeiers' objection;

(c)     Rand failed to make required payments to the Goldmeiers; and

(d)     Stephan Pinsly terminated the Employment Agreements without cause.

Worksman Aff., ¶23; Ex. K (Verified Complaint).

---

[3] Stephan Pinsly, Managing Director of Getzler, Henrich & Associates (middle market corporate turnaround and restructuring firm) was hired at the request of Wells Fargo Bank N.A, the senior secured lender to Rand.

By notice of cross motion dated January 27, 2010 (the "Cross-Motion"), Rand and Mr.

Worksman moved to dismiss the State Court Action on the grounds that, among others, the

action was premature under the terms of the Subordination Agreement which provided in

pertinent part as follows:

> Action on Subordinated Indebtedness.  Except as otherwise permitted
> herein, *the Subordinated Creditor will not commence any action or*
> *proceeding against the Borrower or Guarantor to recover all or any*
> *part of the Subordinated  Indebtedness,* or join with any creditor (unless
> the Senior Lender shall so join) in bringing any proceeding against the
> Borrower or Guarantor under any bankruptcy, reorganization,
> readjustment of debt, arrangement of debt receivership, liquidation or
> insolvency law or statute of the federal or any state government, or take
> possession of, sell, or dispose of any Collateral, *or exercise or enforce*
> *any right or remedy available to the Subordinated Creditor with respect*
> *to any such Collateral, unless and until the Senior Lender Indebtedness*
> *has been paid in full.*

Worksman Aff. ¶25; Ex. D (Subordination Agreement) (emphasis added).

In support of the Cross-Motion, Mr. Worksman submitted an affidavit, sworn to on

February 1, 2010, wherein he identified the underlying motive of the Goldmeiers in

commencing the State Court Action (and this proceeding):

> As shall be further explained in detail below, the present motion for an
> Order of Seizure and Preliminary Injunction is nothing short of a naked
> and blatantly wrongful power grab on the part of the [Goldmeiers] who
> have apparently concluded that "the best defense is a good offense."

Worksman Aff. ¶26.

In further support of the Cross-Motion, Stephan Pinsly as Managing Director of Getzler,

Henrich & Associates, a turnaround firm retained by Rand at the behest of Wells Fargo Bank,

submitted an affidavit, sworn to on February 1, 2010, wherein he disputed the allegations

made by Allen Goldmeier in the State Court Action and alleged, among other things, that:

(a)     the Goldmeiers were involved in the operation of Rand which included their meeting with customers, suppliers and employees;

(b)     the Goldmeiers intentionally excluded Mr. Jonathan Cohen from the management team of Rand;

(c)     Rand was (and is) continuing to operate as a going concern;

(d)     upon information and belief, Wells Fargo had not been paid in full and had not terminated its UCC financial statements; and

(e)     the Goldmeiers were terminated as employees at Mr. Pinsly's request for cause including their "disruptive influence on the operations" and that the Goldmeiers had created the tenuous situation at Rand by their "continuous manipulation of [Worksman] into numerous untenable positions regarding the growth of revenues and not following through on oral promises to subordinate their security interests".

Worksman Aff. ¶27.

On February 18, 2010, the Honorable Timothy S. Driscoll, of the New York State

Supreme Court, rendered a seventeen (17) page written decision which, held in pertinent part,

as follows:

> The Court denies Plaintiffs' applications for injunctive relief and orders of seizure based, in part, on the Court's conclusion that Plaintiffs have not demonstrated a likelihood of success on the merits. In light of the factual disputes regarding numerous issues, including 1) the extent to which the Goldmeiers participated in Rand's daily operations, 2) the quality of the parties' contributions to Rand's daily operations, 3) the extent to which the Goldmeiers and/or Worksman were a causative factor in Rand's difficulties in meeting its financial obligations, 4) the viability of Rand in its current financial condition, and 5) the appropriateness of Rand's decision to terminate the Goldmeiers as
>
> employees of Rand, the Court determines that Plaintiffs have not demonstrated a likelihood of success on the merits.
>
> Moreover, in light of the factual disputes regarding the current viability of Rand, Plaintiffs have not met their burden of establishing irreparable harm without injunctive relief. The Court also concludes that Plaintiffs have not demonstrated that their alleged harm is not compensable by money damages. In addition, Plaintiffs have not offered proof that Wells Fargo consented to this application for an order of seizure, as the

11

Subordination Agreement appears to require.

Finally, the Court also concludes that Plaintiffs have not demonstrated a balancing of the equities in their favor. The Court has not been presented with sufficient proof that, as Plaintiffs, submit, Rand will (fail) without the requested injunctive relief and the value of their interest in the Collateral will be greatly compromised. Indeed, it could well be that Plaintiffs have overstated their role in Rand's viability.

In light of the foregoing, the Court 1) denies Plaintiffs' application in its entirety and 2) vacates the TRO.[4]

\* \* \*

The Court concludes that the applicable provisions of the Subordination Agreement may preclude the instant action unless and until Wells Fargo has been fully paid under the applicable loan documents. The Court, however, cannot determine from the record before it whether full payment has been made to Wells Fargo. Accordingly, the Court denies Defendants' cross motion, with leave to renew upon a showing, based on documentation provided by a representative of Wells Fargo or another source with personal knowledge of the relevant facts, that Wells Fargo has not been fully repaid in connection with the loans at issue.

All matters not decided herein are hereby denied.

This constitutes the decision and order of the Court.

Worksman Aff., ¶28; Ex. L (February 18, 2010 Decision). The Court further directed that all

"parties appear before the Court on March 18, 2010 at 9:30 a.m. for a Preliminary Conference".

## E.    Filing of the Involuntary Petition

Immediately following the issuance of Justice Driscoll's decision on February 18, 2010,

the Goldmeiers promptly embarked on a strategy to preclude Justice Driscoll from making any

further findings on the merits of the issues relevant to the State Court Action and to remove

such dispute to this Court. On February 25, 2010, and within days of the issuance of the

---

[4]As hereinafter discussed, the totality of the facts reflect that the filing of the Involuntary Petition was an attempt by the Goldmeiers to change forums in furtherance of their personal dispute with Mr. Worksman. By way of example, Allen Goldmeier had asserted in the State Court Action that he and his brother had "exhausted their patience" with Mr. Worksman. Worksman Aff. ¶24. The Goldmeiers were never hesitant to express their personal venom of Mr. Worksman in multiple e-mails. Worksman Aff. ¶20; Ex. I.

February 18, 2010 decision, counsel to the Goldmeiers openly expressed to James B. Zane, Esq., Rand's pre-petition counsel, the Goldmeiers' intent to file an involuntary petition. Specifically, Mr. Zane was advised that the Goldmeiers, together with "5 or 6 others," were going to file an involuntary petition in bankruptcy against Rand on or about February 26, 2010 based upon a general perception that there was no hope for Rand's reorganization.  Zane Decl., ¶2.

To that end, the Goldmeiers, utilizing their intimate knowledge of Rand's operations, immediately solicited additional petitioning creditors with the promise and assurance that the Goldmeiers would assume responsibility for all related legal fees.  Worksman Aff., ¶¶42, 52 and 56; Smith Aff. ¶2.  Based on the representations and promises of the Goldmeiers, the Petitioning Creditors, having conducted no independent verification as to the truth of any of the allegations set forth in the Involuntary Petition, supported and approved the same.

On or about March 8, 2010 (ten days prior to the Preliminary Conference scheduled by Justice Driscoll), the Goldmeiers, Century Sports, Executive Importers (each of which is owned by the Goldmeiers), and nine (9) other hand-picked creditors of Rand, filed the Involuntary Petition against Rand in this Court seeking the entry of an Order for Relief under chapter 7 of the Bankruptcy Code.  Worksman Aff., ¶30; Ex. AA (Involuntary Petition).  On March 15, 2010, a corresponding Summons to Involuntary Debtor was issued.   On April 1, 2010, Rand filed and served its Answer to the Involuntary Petition, denying the material allegations therein and asserting seven affirmative defenses.   Worksman Aff., ¶30; Ex. BB (Involuntary Petition).

Notwithstanding the affirmative defenses asserted by Rand, the Goldmeiers filed the Involuntary Petition in bad faith in light of (a) their failure to first schedule a special meeting

13

of the Board to consider the extraordinary measure of seeking bankruptcy relief; (b) their

failure to hold a special meeting of the Board to first obtain the consent of the Board; and (c)

their failure to advise the other Board members of their unilateral decision to liquidate Rand in

bankruptcy.[5] It is respectfully submitted that as a result of the Goldmeiers' failure to obtain

approval of the Board, their affiliated companies, together with the other improperly solicited

Petitioning Creditors, are ineligible Petitioning Creditors because they have not satisfied the

Bankruptcy Code's requirements governing lawful and good faith submission of an involuntary

petition in bankruptcy.

The Involuntary Petition was filed in order to force settlement of a "two party dispute"

between the Goldmeiers and Mr. Worksman. Ultimately, by the Involuntary Petition, the

Goldmeiers seek to regain control of Rand. By this Motion, this Court should dismiss the

Involuntary Petition because the claims of the Petitioning Creditors are subject to bona fide

disputes as to the amount of such claims and/or the liability of Rand in connection therewith.

## ARGUMENT

**A.    Summary Judgment Standard**

Bankruptcy Rule 7056(c), incorporating Federal Rule 56(c) by reference, provides that

a motion for summary judgment shall be granted when "there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.

Civ. P. 56(c) (LexisNexis 2004); *See also* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

---

[5] On April 14, 2010 and at the Pre-Trial Conference, counsel to the Petitioning Creditors advised the Court as follows:

> I think at the end of the day, despite Mr. Pick's hearsay presentation of
> why this case should be dismissed, you'll find that this case, this debtor,
> alleged debtor, is hopelessly insolvent and that is a perfect candidate for
> a liquidation."

(Transcript dated April 14, 2010, Pg. 2, Lines 19-23). This statement was consistent with the statement made to Mr.
Zane on February 25, 2010.

An issue is "genuine" only if there is an evidentiary basis on which a reasonable fact finder could find for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute is "material" only if it could affect the outcome of the suit under governing law. <u>Id</u>. Once the moving party meets its initial burden of identifying those portions of the record demonstrating the absence of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to raise an issue of material fact such that one could reasonably expect that the trier of fact could return a verdict in the nonmoving party's favor. <u>Id</u>. To meet this burden of rebuttal, the nonmoving party must come forward with affirmative evidence in admissible form showing a genuine issue of material fact exists for trial. <u>Celotex</u>, 477 U.S. at 324. Mere "conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." <u>Kulak v. City of New York</u>, 88 F.3d 63, 71 (2d Cir. 1996).

The summary judgment analysis to be employed by this Court with regard to the question of whether the Petitioning Creditors' claims are subject to a bona fide dispute as to liability and/or amount differs somewhat from the general summary judgment standard discussed above. Specifically, in determining whether a petitioning creditor is qualified, the Court "'must determine whether there is an objective basis for either a factual or legal dispute as to the validity of the debt.'" <u>Bartmann v. Maverick Tube Corp.</u>, 853 F.2d 1540, 1542 (10th Cir. 1988) (*quoting* <u>In re Busick</u>, 831 F.2d 745, 750 (7th Cir. 1987)); also see <u>In re Mountain Dairies, Inc.</u>, 372 B.R., 623, 633-34 (Bankr. S.D.N.Y. 2007) ("Thus, after the amendments made by BAPCPA, 'disputes as to amount – not' just liability – are sufficient to create a bona fide dispute."). As such, if there is a genuine issue of material fact that bears upon the alleged debtor's liability on a claim or the amount of said claim, then the petition must be dismissed.

In re Lough, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986); In re Busick, 831 F.2d 745, 750 (7th

Cir. 1987) (If there is a bona fide dispute as to either the law or the facts, then the creditor does

not qualify and the petition must be dismissed.); Liberty Tool & Mfg. v. Vortex Fishing

Systems, Inc. (In re Vortex Fishing Systems, Inc.), 277 F.3d 1057, 1064 (9th Cir. 2001). In

doing so, the Court must analyze the factual and legal issues underlying the dispute alleged by

a debtor in order to ascertain whether an objective legal basis exists for the debtor's challenge

to the debt. However, it is not for the Court to try to predict the disposition of the dispute, but

merely determine whether a bona fide dispute exists. *See, e.g.*, Key Mechanical, Inc v. BDC

56 LLC (In re BDC 56 LLC), 330 F.3d 111, 118 (2d Cir. 2003) ("'[T]he court's objective is to

ascertain whether a dispute that is bona fide exists: the court is not to actually resolve the

dispute.'" (*quoting* Rimell v. Mark Twain Bank (In re Rimell) 946 F.2d 1363, 1365 (8th Cir.

1991)); Metz v. Dilley (In re Dilley), 339 B.R. 1, 6 (B.A.P. 1st Cir. 2006) ("The bankruptcy

court is not to resolve any genuine issues of fact or law; its inquiry is to determine if such an

issue exists... 'This does not mean that the bankruptcy court is totally prohibited from

addressing the legal merits of the alleged dispute; indeed, the bankruptcy court may be

required to conduct a limited analysis of the legal issues in order to ascertain whether an

objective legal basis for the dispute exists.'"); In re Mavella, 149 B.R. 301, 306 (Bankr.

E.D.N.Y.1991) (stating that a court should not undertake to resolve the dispute but instead may

"conduct a limited analysis of the factual and legal issues in order to ascertain whether an

objective legal basis for a dispute exists"). Thus, the Court's analysis on this issue is limited to

whether the factual or legal challenge to the Petitioning Creditors' claims have any genuine

and objectively determinable legal merit.

As reflected by the sworn assertions made in the accompanying affidavits, and as

further evidenced by the exhibits attached thereto, there is no genuine issue of fact that the

Goldmeiers are "insiders" of Rand who initiated the filing of the Involuntary Petition without

the approval of Rand's Board.   There is also no genuine dispute that the Goldmeiers have

improperly used the Bankruptcy Court to divert their struggles with Mr. Worksman from the

Honorable Timothy S. Driscoll to this Court in an attempt to divert the direction of the case

and, thus to control its outcome, if possible, and there should be no dispute that each of the

claims of the Petitioning Creditors are subject to bona fide dispute.

**B.      Summary Judgment Dismissing the Involuntary Petition
and/or Abstention is Appropriate**

      1.      The Involuntary Petition Was Filed Without
the Requisite Approval of Rand's Board of Managers

It is well settled that the filing of a bankruptcy petition on behalf of a corporate entity is

left to the sound discretion of management of involuntary debtor.   In In re Source Enterprise,

Inc., 392 B.R. 541, 554 (S.D.N.Y. 2008), the District Court held as follows:

> [T]he initiation of the [bankruptcy] proceedings, like the run of the
> corporate activities, is left to the corporation itself, ie. to those who have
> the power of management." Price v. Gurney, 324 U.S. 100, 104, 65 S.Ct.
> 513, 89 L. Ed. 776 (1945).   State law governs who has the "power of
> management." In re Stavola/Manson Elec. Co., 94 B.R. 21, 24, (Bankr.
> D. Conn. 1988); see also In re Am. Globus Corp., 195 B.R. 263, 265
> (Bankr. S.D.N.Y. 1996).   Under New York law, it is the board of
> directors that has that authority, see In re Jefferson Casket Co., 182 F.
> 689 (N.D.N.Y. 1910), assuming the bylaws are not in contradiction, see
> Am. Globus, 195 B.R. at 265; see also Adorn Glass & Venetion Blind
> Corp. v. Herbst (In re Adorn Glass & Venetion Blind Corp.), 2004 Bankr.
> LEXIS 2411, at *13-14 (Bankr. S.D.N.Y. 2004).

Id. The filing of a bankruptcy petition is a "special act requiring special authorization and not

a general duty of an officer." In re Al-Wyn Food Dist., 8 B.R. 42, 43 (Bankr. M.D. Fl. 1980);

Regal Cleaners & Dyers, Inc. v. Merlis, 274 F. 915, 916 (2nd Cir. 1921) (citing In re Jefferson

Casket Company, 182 F. 689 (N.D.N.Y. 1910); 6 Collier's (14th ed.) 792)).   In keeping with the

same, the Courts of the Second Circuit have held that "[t]here is no presumption of authority in an officer to make and file a voluntary petition in bankruptcy, and he may not do so without the consent of the directors." Regal Cleaners, 274 F. at 916 (2d Cir. 1921) ("It is clear that special authority of the board of directors of a New York corporation is essential to confer authority upon its president to execute and file a petition on its behalf in voluntary bankruptcy..."). "It is well established that the president of a corporation has no general power to file a petition because such an act goes beyond the daily management of corporate affairs; it is a specific act requiring specific authorization." In re Stavola/Manson Electric Co., 94 B.R. 21, 24 (Bankr. D. Conn. 1988).

As discussed at length above, Rand was operated under the direction of Mark Worksman, its President and Chief Executive Officer, the Goldmeiers, its two Executive Vice-Presidents, and its Board which consisted of Mr. Worksman and Allen Goldmeier. Rand had always complied with the corresponding corporate formalities and had always included the Goldmeiers in major business decisions. By way of example, in its short history of operations Rand scheduled and held a special meeting to approve the APA and, thereafter scheduled and held a second special meeting of the Board on August 4, 2008 for the purpose of seeking approval to enter into a master purchase order assignment agreement with Transcap Trade Finance LLP (and its successor, Wells Fargo Bank and related agreement). Worksman's Aff., ¶17. Unfortunately, Mr. Goldmeier refused to attend the meeting. Worksman's Aff., ¶18.

Although the Goldmeiers' employment with Rand was terminated for cause on October 15, 2009, they continue to be officers of Rand and Allen Goldmeier continues to sit on Rand's Board. It should also not be disputed that the Goldmeiers own Petitioning Creditors Century Sports and Executive Importers. As such, the Goldmeiers are "insiders" of the Debtor who

improperly orchestrated the filing of the Involuntary Petition in order to circumvent the

requisite approval of Rand's Board. As a result, the entire Involuntary Petition, having been

tainted with the Goldmeiers' impropriety, must be dismissed.

2.    The Involuntary Petition, Filed for the Bad Faith Purpose
      of Addressing a Two-Party Dispute, Should be Dismissed

"'[T]here is a presumption of good faith in favor of the petitioning creditor, and thus

the alleged debtor has the burden of proving bad faith.'" Lubow Machine Co., Inc. v.

Bayshore Wire Products Corp. (In re Bayshore Wire Products Corp.), 209 F.3d 100, 105 (2d

Cir. 2000) (quoting United States Fidelity & Guaranty Co. v. DJF Realty & Suppliers, Inc., 58

B.R. 1008, 1011 (N.D.N.Y. 1986)). What constitutes "bad faith" in the context of an

involuntary bankruptcy filing is not defined in the Bankruptcy Code and there is no legislative

history addressing the intended meaning. Id. As a result, the courts have developed a number

of tests and approaches to reach a determination as to whether an involuntary petition was filed

in bad faith. Id.

In Lubow Machine, 209 F.3d 100, the Second Circuit considered the many tests

employed by the various courts as to bad faith noting:

> Some courts have used an "improper use" test, which "finds bad faith when a
> petitioning creditor uses involuntary bankruptcy procedures in an attempt to
> obtain a "disproportionate advantage" for itself, rather than to protect against
> other creditors obtaining disproportionate advantages, particularly when the
> petitioner could have advanced its own interests in a different forum." In re K.P.
> Enter., 135 B.R. 174, 179 n. 14 (Bankr. D. Me. 1992); see also In re Better Care,
> Ltd., 97 B.R. 405, 410-11 (Bankr. N.D. Ill. 1989). Other courts have applied an
> "improper purpose" test, where bad faith exists if the filing of the petition was
> motivated by ill will, malice, or a desire to embarrass or harass the alleged
> debtor. See, e.g., In re Camelot, Inc., 25 B.R. 861, 864 (Bankr. E.D. Tenn.
> 1982). A third line of cases employs an objective test for bad faith based on
> "what a reasonable person would have believed." Jaffe v. Wavelength, Inc. (In
> re Wavelength, Inc.), 61 B.R. 614, 620 (B.A.P. 9th Cir. 1986) (internal quotation
> marks omitted). Finally, as the Eleventh Circuit has observed, a number of
> courts have sought to model the bad faith inquiry on the standards set forth in

> Bankruptcy Rule 9011. *See* <u>General Trading Inc. [v. Yale Materials Handling Corp.</u>], 119 F.3d [1485,] 1501-02 [11th Cir. 1997]; <u>In re Fox Island Square Partnership</u>, 106 B.R. 962, 967-68 (Bankr. N.D. Ill. 1989).

<u>Id</u>. at 105-06. Ultimately, the Second Circuit declined to choose among the above-discussed tests and reversed the bankruptcy court's finding of bad faith based upon perceived factual errors. <u>Id</u>. at 106-07.

Courts have repeatedly stressed that involuntary proceedings are filed in bad faith when the purpose is for a creditor to gain an unfair advantage over the alleged debtor. By way of example, in <u>In re Better Case, Ltd.</u>, 97 B.R. 405 (Bankr. S.D. Ill. 1989) (a case cited by the Second Circuit in <u>Lubow Machine</u>), the court held that "an improper use of the Bankruptcy Code justifying a finding of bad faith will...exist any time a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage. This is especially true when the petitioning creditor could have obtained that advantage in an alternate forum." <u>Id</u>. at 411.[6]

There should be no dispute that the Goldmeiers have zeroed in all of their efforts to re-acquire Rand purely for their own benefit, seize its assets, rid themselves of Mr. Worksman

---

[6] Similarly, in <u>Fraternal Composite Services v. Karczewski</u>, 2004 U.S. Dist. LEXIS 18888, *2-3 (N.D.N.Y 2004), the district court affirmed the bankruptcy court's decision dismissal of a chapter 11 petition on the grounds that it had not been filed in good faith. Although considered in the context of a voluntary chapter 11 petition, in <u>Fraternal Composite</u> a shareholder of the debtor, a corporation, was involved in a state court proceeding whereby the shareholder sought to dissolve the corporation, and at the same time, the debtor's state court action sought to purchase the shareholders stock rather than have it dissolved. <u>Id</u>. at *2. Both parties disagreed as to the value of the stock, however prior to the state court rendering a decision on the matter the debtor filed a voluntary chapter 11 petition. <u>Id</u>. at *3. In response, the shareholder contended that the petition was filed in bad faith. <u>Id</u>. The Bankruptcy Court in <u>Fraternal Composite</u> decided that the debtor had filed its Chapter 11 petition in bad faith, reasoned "...because the state court had not yet issued a judgment on the valuation of the [shareholder's] interest in the corporation, the corporation's intent was to use the bankruptcy process solely as a means to delay, frustrate and re-litigate the state-court issues." <u>Id</u>. When applying this reasoning to the present case, it becomes clear that the Involuntary Petition was not filed in good faith, but rather was knowingly and intentional filed in abject bad faith (constituting, for example not only a two-party dispute but classic forum shopping), and therefore should be dismissed.

and start up a new company (using the Rand name) so as to avoid their non-compete clause with Rand[7] without having to pay the creditors of Rand any money. Such a straight line endeavor is evidenced by many different documents including the October 23, 2007 Letter, multiple e-mails from the Goldmeiers to Mr. Worksman evidencing their intense dislike of Mr. Worksman (*i.e.*, "ill will"); the State Court Action, and the commencement of Landlord/Tenant proceedings (to force the eviction of Rand from the Premises). Having suffered a major setback in the State Court Action, the Goldmeiers concentrated their efforts towards shutting down Rand, believing that Rand could not possibly survive relief in Chapter 11 without the Goldmeiers' allowing use of cash collateral and the Goldmeiers' belief that they could control any creditors' committee that might be appointed in a Chapter 11 case.

Turning to the instant case, it is obvious that the filing of the Involuntary Petition was merely a means by which the Goldmeiers attempted to obtain an disproportionate advantage in connection with the two-party State Court Action and not for the benefit of the creditors of the Alleged Debtor. Indeed, if an Order for Relief under Chapter 7 is entered and Rand is liquidated, it is likely that any proceeds of the estate will be paid over to Century Sports on account of the Subordinated Note and not to any unsecured creditors of Rand. Rand is in daily communication with its creditors and is working to resolve all defaults and to explain its inability to pay in light of the tremendous administrative expenses to the estate in connection with the filing of the Involuntary Petition.[8]

---

[7] On October 27, 2008, counsel for Rand mailed a letter (via Federal Express) to the Goldmeiers reminding them of the restrictive covenants set forth in the April 23, 2007 APA and their respective Employment Agreements precluding them from directly or indirectly owning, managing, operating or participating in any business with Rand for five (5) years.

[8] Rand's arguments in this regard are made without prejudice to its right to seek an award of costs, attorneys' fees, compensatory and/or punitive damages against the Petitioning Creditors pursuant to §303(i) of the Bankruptcy Code. All such rights are hereby expressly reserved by Rand.

3.    This Court Should Abstain From Exercising
Jurisdiction Over This Two-Party Dispute

For reasons similar to those discussed above with regard to the Involuntary Petition

having been filed in bad faith, this Court should abstain from entertaining the Involuntary

Petition. With regard to abstention, §305(a)(1) of the Bankruptcy Code provides, in pertinent

part:

> (a)    The court, after notice and a hearing, may dismiss a case under this title or
> may suspend all proceedings in a case under this title, at any time if –
>
> > (1) the interests of creditors and the debtor would be better served by such
> > dismissal or suspension...

11 U.S.C. §305(a)(1). "'The courts that have construed §305(a)(1) are in general agreement that

abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is

appropriate under §305(a)(1) only in the situation where the court finds that both 'creditors and

the debtor' would be 'better served' by a dismissal.'" In re Monitor Single Lift I, Ltd., 381 B.R.

455, 462 (Bankr. S.D.N.Y. 2008) (quoting In re Eastman, 188 B.R. 621, 624 (B.A.P. 9th Cir.

1995)). The moving party bears the burden of demonstrating that the interests of both the debtor

and its creditors would benefit from dismissal. Id. (citing In re Globo Comunicacoes e

Participacoes S.A., 317 B.R. 235, 255 (S.D.N.Y. 2004). The decision as to whether abstention is

appropriate under §305(a)(1) of the Bankruptcy Code is committed to the court's discretion and

should be made on a case-by-case basis. In re Compania de Alimentos Fargo, S.A., 376 B.R.

427, 433 (Bankr. S.D.N.Y. 2007); Matter of Fitzgerald Group, 38 B.R. 16, 17 (Bankr. S.D.N.Y.

1983).

Bankruptcy courts have considered the following seven factors in determining whether

abstention under §305(a)(1) of the Bankruptcy Code is warranted in a given case:

22

(1)     the economy and efficiency of administration;

(2)     whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3)     whether federal proceedings are necessary to reach a just and equitable solution;

(4)     whether there is an alternative means of achieving an equitable distribution of assets;

(5)     whether the debtor and its creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6)     whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7)     the purpose for which bankruptcy jurisdiction has been sought.

*See*, *e.g.*, Monitor, 381 B.R. at 464-65; Mountain Dairies, 372 B.R. at 625; In re Paper I Partners, L.P., 283 B.R. 661, 678 (Bankr. S.D.N.Y. 2002). Not all factors are to be given equal weight in every case. Monitor, 381 B.R. at 465.

Turning to the instant case, it is respectfully submitted that this Court should abstain from exercising jurisdiction of the Involuntary Petition. As discussed at length above, the Goldmeiers had commenced the State Court Action which was proceeding efficiently. It was only after Judge Driscoll issued his decision of February 18, 2010 ruling against the Goldmeiers that the Goldmeiers took steps toward and ultimately filed the Involuntary Petition against Rand so as to protect their own interests and not those of Rand's other creditors.

4.     The Involuntary Petition Should be Dismissed since the Claims of the Petitioning Creditors are the subject of Bona Fide Dispute

The Involuntary Petition should be dismissed as the claims of the Petitioning Creditors are the subject of a bona fide dispute as to liability and/or amount. Section 303 of the Bankruptcy Code governs involuntary petitions and provides, in pertinent part, as follows:

23

(b)    An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title -

(1)    by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $13,475 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2)    if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $13,475 of such claims.

11 U.S.C. §303(b).  The petitioning creditors have the burden of proving all of the statutory requirements of §303 of the Bankruptcy Code.  *See, e.g.,* In re Palace Oriental Rugs, Inc., 193 B.R. 126, 128 (Bankr. D. Conn. 1996).

The phrase "as to liability *or amount*" was added to §303(b)(1) and (h)(1) following the phrase "bona fide dispute" by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, §§1234(a)(1)(A) and (a)(2), 119 Stat. 23 (April 20, 2005).  The amendment was intended to prevent creditors from using the bankruptcy process as a means of coercing alleged debtors to pay legitimately disputed debts.  *See* Mountain Dairies, 372 B.R. at 634-35 (courts are wary of encouraging two party disputes to use the bankruptcy system as a quick resolution to their disputes).

Prior to the amendment, a dispute concerning the amount of the claim was not a "bona fide dispute" as to the entire claim, under §303(b)(1).  In re Focus Media, Inc., 378 F.3d 916, 926 (9th Cir. 2004) ("a dispute as to the amount of the claim gives rise to a bona fide dispute only when: (1) it does not arise from a wholly separate transaction (2) netting out the claims of

24

the debtors could take the petitioning creditors below the amount threshold of §303") (internal

quotation marks omitted). BDC 56, 330 F.3d at 120 (bona fide dispute exists "where a claim

for offset arises out of the same transaction and is directly related to the creditor's underlying

claim, and, if valid, could serve as a complete defense to that claim"). The 2005 amendments

presumably eliminated the second part of the test. *See* 2 Alan N. Resnick & Henry J. Sommer,

*Collier on Bankruptcy* P 303.03[2][b], at 303-30 (15th rev. ed. 2006). As a result of the

amendment, *any dispute*[9] regarding the amount that arises from the same transaction and is

directly related to the underlying claim should render the claim subject to a bona fide dispute.

Id.

    As discussed above, in considering Rand's request for summary judgment that the

Petitioning Creditors' claims are subject to bona fide disputes as to liability or amount, this

Court is not required to resolve the merits of the alleged dispute, but simply must determine

whether a dispute exists. *See, e.g.*, Platinum Financial Services Corp. v. Byrd (In re Byrd), 357

F.3d 433, 437 (4th Cir. 2004). As set forth in detail in Paragrapsh 32 through 63 of the

Worksman Aff., and the extensive documentary exhibits attached thereto, each of the

Petitioning Creditors' claims was and continues to be disputed by Rand.  Again, the mere

existence of these disputes, regardless of who might ultimately prevail on the merits if tried, is

sufficient to warrant the dismissal of the Involuntary Petition.

---

[9] By way of example, a dispute would exist if a Petitioning Creditor asserted it was owed $5,000 and an alleged debtor's books and records reflected $1,000 as owed, or if a Petitioning Creditor asserted it was owed $1,000 and the alleged debtor's books and records reflected $5,000. The definition of the word "dispute" was meant to read broadly.

**CONCLUSION**

Based upon the foregoing, it is respectfully submitted that Rand is entitled to summary judgment in its favor dismissing the Involuntary Petition and, therefore, the Motion should be granted in its entirety.

Dated:     New York, New York
           May __, 2010

                                        **PICK & ZABICKI LLP**
                                        Counsel to the Alleged Debtor

                            By:     _____
                                    Douglas J. Pick, Esq.
                                    369 Lexington Avenue, 12th Floor
                                    New York, New York 10017
                                    (212) 695-6000