Douglas J. Pick
Eric C. Zabicki
**PICK & ZABICKI LLP**
Counsel to Rand International Leisure Products, LLC
369 Lexington Avenue, 12Th Floor
New York, New York 10017
(212) 695-6000
dpick@picklaw.net

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
In re:

RAND INTERNATIONAL LEISURE PRODUCTS, LLC,

Debtor

Chapter 7 (Involuntary)
Case No. 10-71497(AST)
-----------------------------------------------------x

**MOTION TO DISMISS AMENDED INVOLUNTARY CHAPTER 7 PETITION**

TO THE HONORABLE ALAN S. TRUST,
UNITED STATES BANKRUPTCY JUDGE:

Rand International Leisure Products, LLC ("Rand"), the above-captioned alleged Chapter 7 Debtor, by its attorneys, Pick & Zabicki, LLP, submits this motion (the "Motion") to dismiss the purportedly amended involuntary petition (the "Amended Petition")[1] seeking entry of an Order, substantially: (a) pursuant to Fed. R. Bankr. Proc. 1011, 7012(b)(1) and (6) and Fed. R. Civ. P. 12 (b)(1) and (6), dismissing the Amended Petition on the grounds that: (i) it is facially defective, having been filed without proper execution by all of its designated petitioning creditors and thereby failing to confer upon this Court subject matter jurisdiction; and (ii) it was filed in bad faith, by petitioning creditors led entirely and solely by Allen and Steven Goldmeier (hereinafter sometimes collectively referred to as "the Goldmeiers") who were and are bent on

[1], Rand contends, among other things, that the Amended Petition was not executed by all of the Current Petitioning Creditors (hereafter defined) as of the date filed and, thus, was untimely under this Court's scheduling order (the "Scheduling Order") dated April 27, 2010 . This issue is discussed at length herein below.

Rand's liquidation, or, alternatively, reclaiming all operational control of Rand, and all of whom knew that their claims as asserted in the involuntary petitions were subject to bona fide disputes and who conducted no due diligence whatsoever as to any of the allegations contained in the Initial Petition (hereinafter defined) or the Amended Petition, thereby causing substantial financial damage to Rand[2]; (b) granting judgment in favor of Rand and against the petitioning creditors for any and/or all relief available under 11 U.S.C. § 303(i); (c) in the alternative, deferring consideration of the Amended Petition pending the Court's ruling on Rand's pending motion dated May 6, 2010 for summary judgment (the "Summary Judgment Motion") with respect to the original involuntary petition (the "Initial Petition") dated March 8, 2010, as the amendment of the petition while the Summary Judgment Motion is *sub judice* works substantial prejudice on Rand; (d) in the alternative, pursuant to 11 U.S.C. § 305(a)(1), abstaining or suspending all proceedings in this case; and (e) granting to Rand such other and further relief as may be just and proper.

## SUMMARY OF GROUNDS FOR RELIEF REQUESTED

2. Rand contends that the relief requested in the Motion must be granted because:

(a) subject matter jurisdiction is lacking because all of the current Petitioning Creditors failed to execute the so-called "Amended Petition". The Amended Petition appears to incorporate (without expressly saying so) by reference many of the Petitioning Creditors

[2] As hereinafter discussed, the Goldmeiers overt motive for filing the Initial Petition (hereafter defined) was expressed in an e-mail (to Ellen Liu, of Sales Chief Ent. (Hong Kong) Co., Ltd.) dated March 1, 2010 (Bates stamped as Petitioning Creditors Bates Page No. 3738, a copy of which is attached hereto as *Exhibit "A"*) produced 3 days after Allen Goldmeier's examination as follows: "Hi Ellen, As secured note holders of Rand our attorney has made claims with the judge (referring to the State Court Judge) to allow the Goldmeiers to take control of the company. The motion was opposed by Workmans (sic) opposition so in the end rather than the Judge rule (sic) per the obvious contract defaults we are holding the Judge ordered a further settlement conference a few weeks from now. We look at this as a setback as the time delay allows Workman to continue the dilution of Rands (sic) depleted assets, delays the eviction of him from the building, he (sic) keeps pulling a salary and the Goldmeiers remain sidelined not working. *The answer is to now move it to a bankruptcy court; different Judge and put it into Bankruptcy.*" (emphasis added)

who signed the Initial Petition, rather than, as Rand contends, requiring the incorporation of new verified signatures;

(b) upon information and belief there should be no dispute that subsequent to the filing of Rand's pending Summary Judgment Motion: (i) Sales Chief Ent. (Hong Kong) Co., Ltd., Bargain Furniture, Inc., KKG, Inc. d/b/a Kendal King Group and L.V. International did not sign the solicited Amended Petition; and (ii) Joseph Sandbrook, Executive Importers, LLC, Century Sports, Inc., the Goldmeiers and G Squared Promotions, Ltd. made last-minute changes to either the amounts of their claims (e.g. as hereinafter discussed the claim of G Squared is an entirely different claim) and/or the nature of their respective claims; (iii) Matang Gonzales, Club Marketing Services and Design Edge Inc. are missing from the Amended Petition; and (iv) Cookie Jar Entertainment Inc. has been added. The consequence of all of the foregoing is not an amendment but, in actuality, a "replacement" or a new involuntary petition;

(c) any decision by the Court on the Amended Petition prior to a ruling on the Summary Judgment Motion would cause substantial prejudice to Rand[3] as (i) it allows the petitioning creditors to attempt to improperly cure the multiple defects in the Initial Petition; and (ii) it results in a litigation of two separate petitions and defenses thereto since many of the Petitioning Creditors apparently did not agree to sign the amendment;

(d) the Amended Petition was filed in bad faith[4], was utilized to further a two party litigation strategy, was motivated by an attempt to gain control of Rand and to avoid certain "non-compete" restrictions[5];

---

[3] At the pretrial conference held on April 14, 2010, 30 days prior to the filing of the Amended Petition, counsel to the Petitioning Creditors was made aware that Rand was preparing and intended to file a Summary Judgment Motion. Counsel for the Petitioning Creditors provides no excuse for the relatively late filing of the Amended Petition.

[4] It is submitted that the filing of an involuntary petition as a self-serving litigation strategy could not be more readily demonstrated herein than by Allen Goldmeier in his own words in his deposition taken on May 14, 2010, a copy of which is annexed hereto in its entirety as *Exhibit "B"*, but which is excerpted in pertinent part commencing on Page 4 hereof (the very date that the Amended Petition was due and was filed).

[5] On March 22, 2010 Allen Goldmeier e-mailed to Ellen Liu, General Manager of Sales Chief Ent. (Hong Kong) Co., Ltd as follows: "In the mean time if Rand gets Chapter 7, I can finally get him out of my building and it also ends the dispute on our non-compete contracts. The Goldmeiers could start a new life although continue lawsuits with Worksman. Petitioning Creditors Bates Page No. 3680 (*Exhibit "C"*).

(e) the parties' pending litigation in State Court should be permitted to be brought to a conclusion and accordingly, abstention under § 305 of the Bankruptcy Code is warranted; and

(f) the substantial and grievous harm done to Rand by this baseless filing warrants the grant of judgment under § 303(i) of the Bankruptcy Code in favor of Rand for appropriate damages.

**ALLEN GOLDMEIER DEPOSITION TRANSCRIPT EXCERPT**

**(May 14, 2010)**

Q. … There came a time that you initiated litigation in the state court. At the time that you initiated that litigation was it your intent to reacquire full control of Rand International Leisure Products, LLC; was that your intention?

MR. KUSHNER: Objection, you can answer.

A. My objective was to protect my interest in the company, namely the debt that was owed to me and my brother.

Q. What was the debt that was owed to you?

MR. KUSHNER: When?

MR. PICK: He said the motivation for the commencement of the state court action was to protect the debt owed to him.

MR. KUSHNER: Are you asking him what the debt was at the time that the state court action was filed, is that what you're asking?

MR. PICK: Yes.

Q. What debt were you trying to protect at the time that the state court action was started?

A. The rent, the loan, any salaries, any expenses owed to me and bonuses. Any of the many obligations that he owed.

Q. As part of that action you sought a temporary restraining order and a seizure of the assets; is that not correct?

MR. KUSHNER: Objection, you can answer.

A. We sought a restraining order, yes.

Q. And a seizure of the assets?

A. I can't remember.

Q. Did you seek, if you recall, a court order to reacquire full control of Rand International?

A. I can't remember if it was full control.

Q. But control?

A. Some control, yes.

Q. What do you mean by "some control"?

A. That for once in my life I would have a say in the matter. Whereas Worksman never allowed me to have a true vote at Rand, to have any say in the business decisions of Rand. It was time for me to have some say in Rand inasmuch as Worksman had put the company into a liquidation.

Q. On February 18, 2010, the honorable Timothy S. Driscoll issued his decision on a

request for an injunction and your request for an order of seizure, and he scheduled a further appearance by all parties on March 18, 2010. Do you recall when was the first time you saw a copy of that decision?

A. If he rendered that decision on the 18th it would have been soon after.

Q. A day or two after, if you recall?

A. I can't recall. I presume within a week.

Q. How soon after you were in possession of that decision did you decide to file an involuntary position with the United States Bankruptcy Court for the Eastern District of New York?

A. Immediately after, within the next couple of days.

Q. Did you discuss this with Steven Goldmeier?

A. Yes.

Q. And Steven Goldmeier joined you in deciding that this was an option you should pursue against the company?

A. Yes.

Q. What were your reasons for filing the Chapter 11 petition?

MR. KUSHNER: Objection, you can answer.

A. Because the judge ordered us back to settlement discussions. I'm not aware if the judge realized that I had three-and-a-half months of prior settlement discussions, which just wasted three-and-a-half months of my time, and concluded with the revelation that Worksman didn't want to settle with us anywhere near something that we thought was fair.

Q. When did Judge Driscoll order you back to settlement discussions?

A. I recollect that he mentioned a date that he wanted us to discuss a settlement.

Q. Was that immediately after his determination on February 18th or before his determination on February 18, 2010?

MR. KUSHNER: Objection, you ca answer.

A. What I recall is the settlement discussion date was a few weeks after.

Q. When did Judge Driscoll order you back to settlement discussions?

A. At a date after he rendered his decision.

Q. Are there any other reasons that you have for the filing of the Chapter 11 petition, other than Judge Driscoll ordered you back to settlement discussions?

MR. KUSHNER: And other than seeking to protect his investments, his assets, things like that.

MR. PICK: That wasn't his testimony; that is your testimony, Mr. Kushner.

MR. KUSHNER: That's what I think he said.

MR. PICK: I'm asking him for his testimony. Please, I would appreciate --

MR. KUSHNER: If you're going to include "other" then you should include the comprehensive list of things that he testified to.

MR. PICK: You're testifying for the witness, Mr. Kushner.

Q. I'll ask you again. What other reasons did you have for the filing of the Chapter 11 petition immediately following Judge Driscoll's decision on February 18, 2010?

A. The answer is obvious, to protect whatever remaining assets was left at Rand that was at the time solely under Worksman's control, and the assets were being diluted each and every day, and continue to be diluted; we just felt that it's time to go to the bankruptcy court. And if he's not going to pay me rent, then we're going to have to get a ruling on his operating from my property and put an end to this never-ending discussion of settling that was going nowhere. He

didn't really want to settling by offering us anything that was fair.

Q. Were there any other reasons other than to protect your assets, which we just heard from your counsel?

MR. KUSHNER: And himself.

Q. And your dissatisfaction with the fact that Judge Driscoll ordered you back to settle the discussions?

A. Worksman was in default of all his obligations to us. He wasn't honoring the employment contract, he wasn't honoring the payments. He kept telling me that we can't compete with him. I'm saying that you defaulted on all the contracts that we had with you from A to Z, and meanwhile you're telling me that we're compelled to certain aspects of the agreement. So we decided to let the bankruptcy court rule on this situation.

Q. Just to be complete. Are there any other reasons you had for the filing of the Chapter 11 petition, other than what you just testified to?

A. To get justice as far as all obligations that he owes to us, encompassing everything.

Q. Okay. I just want to know all your reasons, and that encapsulates all your reasons?

A. Yes.

Q. Okay.

A. There's another reason, I wanted to move on with my life.

Q. What does that mean?

A. If I'm going to dispute this business deal that we had with Worksman for weeks and months ongoing I said it's going nowhere, so let's just end the dispute and get a ruling from a court. The ruling that we had from Judge Driscoll was to continue settlement discussions and Worksman didn't want to settle. So continuing to talk another round of weeks, possibly months, and just being dragged through the mud further, we figured let's just go to a more expedient avenue to resolve these disputes and that was the bankruptcy court.

Q. Was that your decision to go to bankruptcy court?

A. It was the decision of my brother and myself. Then I asked Gary for his thoughts.

Q. And the determination was then made to file the petition?

A. Yes.

Q. What thoughts did your brother Steven have that were stated to you with respect to the filing of the involuntary petition?

A. His thoughts paralleled the thoughts I just stated.

Q. They were exactly the same, there were no other reasons given?

A. I told you it's to encompass --

Q. You don't have to repeat what you said. I'm just trying to make sure it's all consistent?

A. I told you to encompass a finalization of the entire dispute. Not limited to anything in particular, just to end the dispute and move on with our lives. So Steven agreed that to get out of a disputed matter that was lingering for months we felt that Mr. Driscoll, he didn't understand, or I should say Judge Driscoll didn't understand that we've already been discussing a settlement for months and months and it was going nowhere. So rather than just continue through an endless discussion that was not going to get resolved, we figured let's just go to the bankruptcy court and we'll get a faster decision.

Q. The disputes that you wanted a faster decision related to the disputes before Judge Driscoll and in a landlord/tenant court, or just before Judge Driscoll?

A. We went to the bankruptcy court to get a disposition on all disputes.

Q. So the disputes that you're referring to are the disputes that were before Judge Driscoll in the state court action, and the disputes that were pending in the landlord/tenant court?

MR. KUSHNER: Objection. Just for the record --

MR. PICK: Let me finish the sentence.

MR. KUSHNER: Doug, you're giving him wrong information. The landlord/tenant proceeding was filed a day after the bankruptcy court, so you're asking him an improper question.

Q. You signed the notice of petition on March 3 but it was filed the day after. Wasn't there a prior pending action filed in Nassau County that was dismissed prior to the filing of the involuntary petition?

A. I think we withdrew that because we filed in Nassau, and then we discovered it should be filed in Suffolk.

Q. Right. So there was a prior pending dispute in the landlord/tenant court, it was filed in the wrong court.

MR. KUSHNER: The landlord/tenant court you're referring to is in the exhibit that was memorialized by the landlord/tenant petition.

MR. PICK: That's the same dispute, but I don't mind.

Q. What you're testifying today is that basically you were trying to resolve all the disputes in the bankruptcy court that was pending in the state court before Judge Driscoll?

A. Whatever they were, all of the disputes. I'm sure the bankruptcy judge is going to rule on the entire issue.

See Allen Goldmeier Deposition Transcript (hereinafter "Goldmeir TR") at page 177 (commencing as line 8) through 188 (ending on line 3).

**BACKGROUND**

3. For a detailed discussion of the factual background of this case, the Court is respectfully referred to the papers submitted by Rand in support of the Summary Judgment Motion, including the supporting affidavits and memorandum of law. All defined terms used in the Summary Judgment papers are applicable herein. Rand incorporates by reference the affidavits accompanying the Summary Judgment Motion of Rand's President and Chief Executive Officer, Mark Worksman and the exhibits annexed thereto (the "Worksman Aff."); Stephan Pinsly, Managing Director with Getzler, Henrich & Associates, LLC (the "Pinsley Aff."); Sean Smith, a Consultant with Getzler, Henrich & Associates, LLC (the "Smith Aff."); and the declaration of James B, Zane, Esq. (the "Zane Decl."). It is submitted that in addition to

the reasons given above, the Initial Petition and the Amended Petition[6] must be dismissed because: (a) Petitioning Creditor Allen Goldmeier did not seek or obtain the requisite corporate approval of Rand's Board of Managers (on which Allen Goldmeier sits) prior to filing the any petition; (b) the Involuntary Petition was filed in bad faith to frustrate the State Court Action relating to a bitterly contentious two-party struggle over the control of Rand as between the Goldmeiers and Mark Worksman, which dispute was otherwise proceeding efficiently in the State Court Action; and (c) each of the respective claims of the Original Petitioning Creditors and the petitioning creditors named in the Amended Petition (the "Current Petitioning Creditors") is subject to a bona fide dispute as to the amount of such claim and/or liability of Rand in connection therewith.

**SOLICITATION OF PARTICIPATION IN INVOLUNTARY PETITIONS AND THE GOLDMEIERS' ASSUMTION OF CERTAIN CREDITOR OBLIGATIONS IN CONSIDERATION FOR SUCH PARTICIPATION**

4. On or about March 8, 2010 (the "Petition Date"), the Petition was filed, purportedly by thirteen (13) petitioning creditors (the "Original Petitioning Creditors"), seeking relief under Chapter 7, title 11, United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). As an involuntary "gap debtor," Rand has continued in operation of its business and management of its affairs. Of the Original Petitioning Creditors, four (4) were insiders. The other petitioning creditors were improperly solicited by the Goldmeiers, as described below, by a combination of providing misleading and/or misstated facts, making false promises and/or by their failure to reveal the actual self-serving reasons for the solicitation of potential petitioning creditors. In order to induce creditors to sign, they were advised that they need not engage their

[6] The Summary Judgment Motion was addressed to the Initial Petition; however, except as otherwise set forth below, the arguments contained therein are equally applicable in favor of dismissal of the Amended Petition.

own counsel. By way of example only, on May 3, 2010, Ellen Liu, General Manger of Sales Chief, raised a concern to Allen Goldmeier over incurring legal fees:

> Meanwhile, I would like to clarify with you on the attorney fee for this case, please advise who will be responsible for this cost? As you know that we have been damaged with big amount of money owed by Rand, and even we can win the case and get Rand to go bankrupt, we don't expect that Rand will have money left to pay all the creditors, therefore, I did not plan to spend the cost. I did not ask you this question when I agreed to sign the petition, but I think we should clarify this point by now before further going on this case. Please Confirm

Petitioning Creditors' Bates Page No. 3388 (part of *Exhibit "D"*). On May 6, 2010, Allen Goldmeier responded as follows:

> From: allengoldmeier@aol.com
> Sent: Thursday, May 06, 2010 2:48 AM
> To: tpe-ellen@saleschief.com.tw
> Cc: allengoldmeier@aol.com
> Subject: Re: Rand
>
> Dear Ellen
> My attorney has advised that Sales Chief does not have to hire their own attorney, although we still request that you cooperate ongoing as a petitioner. My attorney will be involved at all times during your cooperation and I have to pay my attorney, you don't. This means I'm not paying your legal bill; I'm paying my legal bill which includes the timeframe spent on your cooperation.
> [Ellen Liu] Thanks for your confirmation, noted.
>
> For your cooperation, we will need you to be available for a video telephone conference to do the deposition and to also be available via video telephone conference during the trial dates, June 16 and possibly June 18. By the way, during deposition my attorney will instruct you what to answer and what not to answer. So its only a matter of providing honest answers to the questions pertaining to the payment issues.
>
> Petitioning Creditors Bates Page No. 3387 (part of *Exhibit "D"*)

-and-

From: allengoldmeier@aol.com
Sent: Wednesday, March 03, 2010 4:23 PM
To: Matang Gonzales
Cc: Steven Goldmeier
Subject: From Mat Gonzales

Hi Mat,
We believe a counter action for trying to get payment satisfaction is highly unlikely. We already have a sufficient # of creditors signed up. By you signing the petition I am covering your claim under the cost of my attorney, and also covering if they contest it.
There's many dozens of creditors, and the strength behind these several claimants make us believe they couldn't possibly counter per your concern.
Once again pls check with your attny. To help you decide if you would like to sign back and join in under my umbrella, or if its best you continue your independent claim?
Mat, I am very, very sorry you became stuck in this. I could never imagined that Rand would end up in this situation.
Allen
Sent via BlackBerry byAT&T

Petitioning Creditors' Bates Page No. 3654 (*Exhibit "E"*)

-and-

From: allengoldmeier@aol.com [mailto:allengoldmeier@aol.com]
Sent: Thursday, April 29, 2010 6:55 PM
To: Earl Spencer
Cc: Chandler Armistead
Subject: response

As far as your bankruptcy petition; you do not need to hire your own attorney for the deposition process. Actually my attorney will oversee the process of your deposition. In preparation of this, hopefully you can document that Rand owes you every penny of the petitioned debt. Anything you have on file relative to proving the amount is due would be helpful because Worksman is going to lie and dispute the obligation and make a case that your trying to cheat him. You also may want to jot some notes recalling prior conversations you've had with him, and anything that is relative to demonstrate his lack of integrity and/or managerial ability.
Additionally, the various problems he's had with the owners of magnolia and KW, and the problems you';ve had it trying to maintain their support of Rand. It all relates to why he is now in a bankruptcy proceeding, presently trying to cheat the creditors.
That's it for now. Justice will prevail! If not we'll call Mark Dauler.
Allen

Petitioning Creditors' Bates No. 3280 (*Exhibit "F"*)

-and-

From: <allengoldmeier@aol.com>
Sent: Monday, March 08, 2010 7:14 AM
To: "Ellen Liu" <tpe-ellen@saleschief.com.tw>
Cc: "Paul Su" <tpe-paul@salschief.com.tw>
Subject: "Rand

Hi Ellen,
Looks like tmmrw my lawyer will proceed filing the bankruptcy petition as Worksman has offered nothing to settle other than threatening the Goldmeiers with lawsuits.
[Ellen Liu] Noted.

Petitioning Creditors Bates Page No. 3383 (*Exhibit "D"*)

5. Amazingly, the making of these promises was denied by Allen Goldmeier in his deposition. By way of example when asked about his representations made to Mr. Gonzales, Mr. Goldmeier testified as follows:

Q. On the bottom of the page it says, "Hi Allen, I spoke with Brian Hufnagel and he said I should ask you if you are going to 'cover me' if a legal action backfires and Rand comes after me for damages. Will you do this for me? Matt." Do you understand what he was asking you?
A. Yes.
Q. What was he asking you?
A. If he gets counter-sued will I cover him, meaning I guess his costs.
Q. Did you promise to cover his costs?
A. No, I did not.
Q. Did you promise to cover his legal fees?
A. No
Q. Did you promise any of the petitioning creditors to cover their legal fees?
A. No. I pay my own legal fees.
Q. Did you make any promises to any of the petitioning creditors when you solicited them to sign the involuntary petition?
Mr. Kushner: Objection, you can answer
A. No, I did not.

Goldmeier TR. Page 226 (commencing with line 13) and 227 (ending with line 12)

6. Consequently, and after consultation with their own counsel, several of the Original Petitioning Creditors had thought better of their actions and have sought leave of this Court to withdraw as petitioning creditors.

**A. The Goal of the Dispute Between the Goldmeiers and the Ensuing State Court Litigation Was the Goldmeiers' Immediate Reacquisition of Operational Control of Rand, and Relief From Their Non-Compete Obligations.**

7. On October 15, 2009, the Goldmeirs were discharged as employees of Rand for cause (Goldmeier TR, page 7 lines 13-15) (Also see Affidavit of Scott Pinsley ¶ 5 therein).

8. Immediately following their termination, and by letter dated October 23, 2009 (the "October 23, 2009 Letter"), the Goldmeiers and Century Sports, by their counsel, advised Rand and Mr. Worksman that, among other things, the Goldmeiers had accelerated the maturity of the Subordinated Note and all other amounts allegedly owed to them and demanded payment in full of all such indebtedness. Worksman Aff., ¶21; Ex. J (October 23, 2009 Letter). The October 23, 2009 Letter further advised that "[a]s a result of the occurrence of Events of Default....Rand [International Leisure Products Ltd.] hereby elects to exercise all of its rights, powers and remedies under the POA [*i.e.*, power of attorney] and the other Loan Documents by, among other things, *assuming the immediate assumption of its right to manage and operate the Company.*" (*emphasis added*). Id

9. There is no dispute that after issuance of the October 23, 2007 Letter, the Goldmeiers had multiple unsuccessful meetings with Mr. Worksman, as set forth in the Goldmeier Verified Complaint:

> Despite over ten (10) meetings with Worksman, his counsel and the consultant (referring to Stephan Pinsly), Rand has not and will not provide a workable solution to the Goldmeiers..."

Worksman Aff., ¶21 [FN 3].

10. Totally unsatisfied in their negotiations with Rand, the Goldmeiers decided to try and ratchet up the pressure on Mr. Worksman. Accordingly, on January 19, 2010, counsel to the Goldmeiers gave notice of presentment of an order to show cause for a temporary restraining order (the "Order to Show Cause") and other provisional relief in the New York State Supreme Court located in Mineola. On January 20, 2010, the Goldmeiers and Century Sports commenced an action against Rand and Mr. Worksman in the Supreme Court of the State of New York, County of Nassau, captioned *Allen Goldmeier, Steven Goldmeier and Century Sports, Inc. f/k/a Rand International Leisure Products, Ltd. v. Mark Worksman and Rand International Leisure Products, LLC f/k/a Rand International Acquisition I, LLC, and Meltzer, Lippe, Goldstein & Breitstone, LLP,* Index No. 1315/2010 (the "State Court Action"). Worksman Aff., ¶22; Ex. K (Verified Complaint). Pursuant to the State Court Action, the Goldmeiers and Century Sports sought, among other relief, a temporary restraining order directing the delivery and turnover to Century Sports of Mr. Worksman's 100% membership interest in Rand, an order of seizure of the assets of Rand, money judgments against Rand and Mr. Worksman and an order precluding Rand and/or Mr. Worksman from taking any steps to assign, sell and/or transfer any of the collateral securing the Subordinated Note held by Century Sports. Worksman Aff. ¶22; Ex. K (Verified Complaint).

11. In support of the Cross-Motion, Mr. Worksman submitted an affidavit, sworn to on February 1, 2010, wherein he identified to the State Supreme Court the underlying motive of the Goldmeiers in commencing the State Court Action (and this proceeding):

> As shall be further explained in detail below, the present motion for an Order of Seizure and Preliminary Injunction is nothing short of a naked

> and blatantly wrongful power grab on the part of the [Goldmeiers] who have apparently concluded that "the best defense is a good offense."

Worksman Aff. ¶26.

12. In further support of the Cross-Motion, Stephan Pinsly as Managing Director of Getzler, Henrich & Associates, a turnaround firm retained by Rand at the behest of Wells Fargo Bank, submitted an affidavit, sworn to on February 1, 2010, wherein Mr. Pinsly disputed the allegations made by Allen Goldmeier in the State Court Action and alleged, among other things, that the Goldmeiers were actively involved in the operation of Rand which included their meeting with customers, suppliers and employees and that the Goldmeiers were terminated as employees at Mr. Pinsly's request for cause including their "disruptive influence on the operations" of Rand and that the Goldmeiers had created the tenuous situation at Rand by their "continuous manipulation of [Worksman] into numerous untenable positions regarding the growth of revenues and not following through on oral promises to subordinate their security interests". Worksman Aff. ¶27.

13. On February 18, 2010, the Honorable Timothy S. Driscoll, of the New York State Supreme Court, rendered a seventeen (17) page written decision which, held in pertinent part, as follows:

> The Court denies Plaintiffs' applications for injunctive relief and orders of seizure based, in part, on the Court's conclusion that Plaintiffs have not demonstrated a likelihood of success on the merits. In light of the factual disputes regarding numerous issues, including 1) the extent to which the Goldmeiers participated in Rand's daily operations, 2) the quality of the parties' contributions to Rand's daily operations, 3) the extent to which the Goldmeiers and/or Worksman were a causative factor in Rand's difficulties in meeting its financial obligations, 4) the viability of Rand in its current financial condition, and 5) the appropriateness of Rand's decision to terminate the Goldmeiers as employees of Rand, the Court determines that Plaintiffs have not demonstrated a likelihood of success on the merits.

> Moreover, in light of the factual disputes regarding the current viability of Rand, Plaintiffs have not met their burden of establishing irreparable harm without injunctive relief. The Court also concludes that Plaintiffs have not demonstrated that their alleged harm is not compensable by money damages. In addition, Plaintiffs have not offered proof that Wells Fargo consented to this application for an order of seizure, as the Subordination Agreement appears to require.
>
> Finally, the Court also concludes that Plaintiffs have not demonstrated a balancing of the equities in their favor. The Court has not been presented with sufficient proof that, as Plaintiffs, submit, Rand will (fail) without the requested injunctive relief and the value of their interest in the Collateral will be greatly compromised. Indeed, it could well be that Plaintiffs have overstated their role in Rand's viability.
>
> In light of the foregoing, the Court 1) denies Plaintiffs' application in its entirety and 2) vacates the TRO.
>
> * * *
>
> The Court concludes that the applicable provisions of the Subordination Agreement may preclude the instant action unless and until Wells Fargo has been fully paid under the applicable loan documents. The Court, however, cannot determine from the record before it whether full payment has been made to Wells Fargo. Accordingly, the Court denies Defendants' cross motion, with leave to renew upon a showing, based on documentation provided by a representative of Wells Fargo or another source with personal knowledge of the relevant facts, that Wells Fargo has not been fully repaid in connection with the loans at issue.
>
> All matters not decided herein are hereby denied.
>
> This constitutes the decision and order of the Court.

Worksman Aff., ¶28; Ex. L (February 18, 2010 Decision). The Court further directed that all "parties appear before the Court on March 18, 2010 at 9:30 a.m. for a Preliminary Conference".

14. As acknowledged by Allen Goldmeier, and as discussed above, the results of Justice Driscoll's decision were utterly disappointing and did not result in their acquiring the immediate and complete control of Rand as they had envisioned.

**B. Frustrated And Impatient With Justice Driscoll, The Goldmeiers Embrace A New Litigation Strategy: The Filing of the Involuntary Petition:**

15. Immediately following the issuance of Justice Driscoll's decision on February 18, 2010, the Goldmeiers, embarked on a new strategy so to preclude Justice Driscoll from making any further findings on the merits of the issues relevant to the State Court Action and to remove the contested disputes to this Court. Their intent was not kept secret from anyone. On February 25, 2010, and within days of the issuance of the February 18, 2010 decision, counsel to the Goldmeiers openly expressed to James B. Zane, Esq., Rand's pre-petition counsel, the Goldmeiers' intent and determination to file an involuntary petition. Specifically, Mr. Zane was advised that the Goldmeiers, together with "5 or 6 others," were going to file an involuntary petition in bankruptcy against Rand on or about February 26, 2010 based upon a general perception that there was no hope for Rand's reorganization. Zane Decl., ¶2.

16. The Goldmeiers immediately solicited participation by other petitioning creditors, admitting that their motivation was twofold: (a) their impatience with Judge Driscoll in the State Court Action; and (b) a clear intention to wrest control of the business and the Premises from Mr. Worksman and to get out from under the non-compete covenant. While solicitation of creditors to participate in an involuntary petition is not *per se* prohibited, the conduct here of the Goldmeier demonstrably rose to the level of a bad faith filing, and should not be countenanced by this Court. When questioned about his contacts and discussions with the Petitioning Creditors, Allen Goldmeier testified as follows:

> Q. When you had a discussion with your brother, Steven Goldmeier, and you decided that you were going to be filing an involuntary petition with the bankruptcy court; did you then have any discussions with any of the petitioning creditors that are listed in the involuntary petition?

A. At that time?
Q. At that time.
A. No, we didn't weigh in to any petitioners what we should do. We decided at that time, just Steven and myself, and then we spoke to counsel to let's get a quicker end to this dispute and go to bankruptcy court.
Q. When was the first time that you reached out to a creditor to join you in the signing of an involuntary petition?
A. I don't know if it was within the first week or the second week of that decision, or the third week.
Q. Was there anyone else reaching out to creditors to sign an involuntary petition, other than you and your brother Steven?
A. Not that I'm aware of. I was under the impression that we needed a couple of creditors and a lot of the people who were owed money from Rand kept asking me is Rand going to pay us and I kept telling them I don't know. I don' know if I'm going to get paid either. Worksman is controlling the checkbook and the finances, as he always did.
I said I really can't help you to get paid. We've decided to become petitioners and you're welcome to become petitioners also.
That's your own business decision, that's not mine. I make my own business decisions.
MR. KUSHNER: I just got an e-mail from Brian Hufnagel under my proposed order, I don't know if it's going to be signed, the amended discovery schedule. I put in that we would advise you of proposed deposition dates.
Brian advises me that Joseph Sandbrook could be available the 24th
MR. PICK: Can we do it afterwards because I have to get my calendar out ....

Goldmeier TR Page 188 (commencing line 5) through Page 190 (ending on line 22) *(Exhibit "B").*

17. When questioned about the benefits, if any, that might be gained by the General unsecured claimants resulting from the filing of an involuntary petition,, Allen Goldmeier testified that he had no "great expectations of distributions in this bankruptcy case". Goldmeier TR at Page 223, line 9 through 19. *(Exhibit "B")* Based solely on the representations and promises made by the Goldmeiers, the Petitioning Creditors conducted no independent verification whatsoever as to the truth of any of the allegations set forth in the Involuntary Petition and did not seek the benefit of legal advice. In essence then, both the Original Petitioning Creditors and the Current Petitioning Creditors, to the extent of their actual execution of the Initial Petition and/or the Amended Petition, under the standards of

Bankruptcy Rule 9011, conducted absolutely no due diligence whatsoever. It is submitted that the Goldmeiers' solicitation constituted a clearly impermissible solicitation technique, and rises to the level of bad faith, both on the part of the Goldmeiers and the petitioners so solicited. This is readily apparent in that three of the Original Petitioning Creditors, having subsequently consulted with their own counsel, quickly moved to withdraw their names from the Initial Petition. In fact, on March 1, 2010, in an e-mail from Allen Goldmeier to Ellen Liu, Mr. Goldmeier makes it explicitly clear that his motive in soliciting petitioning creditors: "To push him into bankruptcy we need other creditors other than the Goldmeiers to sign the petition to make it a less contestable process".

From: allengoldmeier@aol.com
Sent: Monday, March 01, 2010 5:18 PM
To: Ellen Liu
Cc: Steven Goldmeier
Subject: Rand
Hi Ellen

As secured note holders of Rand out attorney has made claims with the judge to allow the Goldmeiers to take control of the company. The motion was opposed by Worksmans opposition so in the end rather than the Judge rule per the obvious contract defaults we are holding, the Judge ordered a further settlement conference a few weeks from now. We look at this as a setback as the time delay allows Worksman to continue the dilution of Rands depleted assets, delays the eviction of him from the building, he keeps pulling a salary and the Goldmeiers remain sidelined not working. *The Answer is to now move it to bankruptcy court; different Judge and put it into Bankruptcty.* This is what we would eventually had to do even if we did get control back, but now we have no choice to go this route at once even if its still under Worksmans control. *The situation is inevitable as there is no way Worksman is going to refinance the company as the Goldmeiers have the first position and since he's not going to pay us we're not going to subordinate the first position of our note to allow a refinance.* Rand has so much debt, I don't think he will refinance anyway. The present business is minimal, and its only a matter of time.

*To push him into a bankruptcy we need other creditors other than the Godmeirs to sign the petition to make it a less contestable process.* My attorney well knows of your company as he's friends with the NY attorney that you were using a few months ago. My attorney is waiting to hear from yours if you will agree to sign the bankruptcy petition to move this along.

Now here's what you need to think about.

1. Is there any further legal cost to you if you do? I don't think so. We just need your signature and the updated amount that Rand presently owes you.

2. How does that affect your Winston program? It doesn't and we realize this bz is

valuable to both you and VKS, as Winston is presently nominated by Walmart and we respect not to jeopardize that for Sales Chief.

3. If Rand goes B, do you get any money back on the prior debt from Rands liquidation. The answer is Worksman has already depleted most of the remaining assets so the unsecured creditors will not recover. The secured creditor, us, may not get anything either?

*4. How does Sales Chief get old money back??? We have to sit down with you and start a new business. A business where we are in a partnership. We buy from you and you make your standard fob commission and become a partner in the domestic profit of the new business. You own the inventory, the receiables. The A/R could pay to your USA bank. New low overhead approach.*

5. What is the new business. We have a plan to make it respectable and profitable and we have a valuable new patent to talk to you about and other projects.

6. Target Store; we would have to go there with you and keep you as the same vendor as prior; just new banking info.

7. Walmart: we have a plan to address these politics and take back a share of the business as of January 2011. This does not mean you give up Winston; it only means that if some of the business sings back to a new company that we are partners with you, you then get paid back on the prior from the profit split.

8. Also we can develop some fob business to ship this year. Can set up where the LC opens to you in China via new Co. Name. Use this also for Target import orders.

*9. New license opportunity to talk to you at once.*

Need to talk to your level of interest in this concept. Also I will send you the attorneys name in an email to follow regarding the signing of bankruptcy.

Petitioning Creditors' Bates Page No. 3738 (see *Exhibit "A"*) (emphasis added).

18. Indeed, as a result of discovery produced by counsel to the Current Petitioning Creditors, the case for dismissal of the Amended Petition has become all the more compelling.

19. There is no shortage of e-mails or deposition testimony from Allen Goldmeier that his feelings toward Mark 'Worksman was one of complete and utter contempt. By way of example only, the Goldmeier Transcript is filled with Allen Goldmeier's denunciations of Mr. Worksman. By way of example only:

Q: You're really angry at him, aren't you?
A: No, I love the guy.
MR. KUSHNER: Lets' not get into a debate.

MR. PICK: I'm not debating, I'm asking him based on his answer.
A: He screwed the hell out of me. Life is Life

Goldmeier TR at p. 154 lines 4-12 (*Exhibit "B"*)

## ARGUMENT

## POINT ONE

## THE AMENDED PETITION WAS UNSIGNED BY ALL OF THE CURRENT PETITIONING CREDITORS AS OF THE DEADLINE IMPOSED BY THE COURT FOR AMENDMENT AND HENCE SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

20. After numerous demands and much footdragging (including an initial outright refusal to produce), counsel for the Current Petitioning Creditors finally produced a copy of the Amended Petition with what purports to be copies of signatures. That reluctance to produce suggested to Rand's counsel that, perhaps, the Current Petitioning Creditors whose execution were confirmed by an /s/ on the Amended Petition as ultimately filed, did not, in fact, execute the Amended Petition at all; or certainly not by the May 14, 2010 deadline imposed by the Court. This suspicion was vindicated in that the "executed" Amended Petition, as ultimately produced, contained only three (3) signatures, exclusive of the four insiders (the Goldmeiers, Century Sport and Executive Imports), and of those, only two are dated and seem to be executed for the purposes of the Amended Petition (the other, Joseph Sandbrook, still being dated as of March 3, 2010). As this Court is aware, the Scheduling Order required that the Amended Petition be filed (and therefore fully executed) by no later than May 14, 2010.

21. The Scheduling Order was entered on April 27, 2010. The Summary Judgment Motion was dated and filed as of May 6, 2010. Counsel for Rand was conducting a deposition of Allen Goldmeier on May 14, 2010 and the Amended Petition had not yet been

filed until 4:50 p.m. (after the examination concluded for the day), although there was certainly more than adequate opportunity to comply with the Scheduling Order. When questioned about the alleged Amended Involuntary Petition, Mr. Goldmeier testified as follows:

> Q. Mr. Kushner has stated on the record that you're filing, or intend to file an amended involuntary petition. Are you increasing or reducing the amount of the claim that you are asserting is owed to you?
> A. I'm not sure at this stage.
> Q. You don't know? Did you sign it today?
> A. I signed some documents today. I don't know if I signed that one.
> MR. KUSHNER: Again, we would be happy to get it for you.
> MR. PICK: No. I'm going to bring to this the judge's attention to how evasive Mr. Goldmeier is.
> MR. KUSHNER: He doesn't have it in front of him
> Q. Do you recall signing an amended involuntary petition?
> MR. PICK: Let the record reflect he has to think about it.
> A. I don't know which document I signed and didn't sign. Did I sign it Gary?
> Q. No, don't ask your attorney. I'm asking you. If you have no recollection as to having signed an amended involuntary petition state so on the record, that's all I'm asking you.
> A. I don't want to say something that's incorrect. I can ask Brian.
> Q. No. I am asking you. Do you recall signing an amended involuntary petition recently? It's a yes or no answer.
> A. I think I signed it.
> Q. You think you signed it?
> A. Yeah. I signed some other documents today. I think I signed that also.

Goldmeier TR at Page 198 (commencing on line 17) through Page 200 ( concluding at line 6 (*Exhibit "B"*).

-and-

> Q: Did you sign or do you recall signing today an amended involuntary petition?
> A: I am not sure if I signed that, I can't remember.
> Q. Okay. That's fine. When and if it gets filed I'll see the date on it and we'll take it from there.

Goldmeier TR at page 201, lines 12-18 (*Exhibit "B"*).

22. As to the (non-insider) signatures that do purport to have been obtained, Rand's counsel has yet to be able to obtain discovery as to the dating and bona fides of those signatures, though demand has been duly made. Just as it is impermissible and ineffective *ab initio* for an attorney to sign a petition on behalf of a debtor, *See* In re Vitagliano, 303 B.R. 292 (Bankr., W.D.N.Y. 2003), it stands to reason that, in the absence of a sufficient number of true, verified signatures of petitioning creditors, an involuntary petition must also be deemed void. Counsel for the Current Petitioning Creditors have advised that two (2) of those creditors, for whom new signatures did purport to be obtained prior to the May 14th deadline, are (coincidentally?) unavailable for deposition until June 4, 2010, well after the deadline for Rand's counsel to file this Motion. Thus, Rand's counsel is unable to determine whether a sufficient number of petitioning creditors timely executed the Amended Petition in accordance with the Scheduling Order. Specifically, Sales Chief Ent. (Hong Kong) Co., Ltd., Bargain Furniture, Inc., KKG, Inc. d/b/a Kendal King Group and L.V. International did not sign the solicited Amended Petition; (ii) Joseph Sandbrook, Executive Importers, LLC, Century Sports, Inc., the Goldmeiers and G Squared Promotions, Ltd. made last-minute changes to either the amounts of their claims and/or the nature of their respective claims; (iii) Matang Gonzales, Club Marketing Services and Design Edge Inc. are missing from the Amended Petition; and (iv) Cookie Jar Entertainment Inc. has been added as a petitioning creditor to the Amended Petition, the consequence of all of the foregoing is an invalid Amended Petition.

23. The filing of an involuntary bankruptcy petition is a serious matter. The number and verification of petitioning creditors is critical; as an involuntary petition is predicated upon specific allegations concerning: (a) amount of total unsecured indebtedness; and (b) the debtor's status as generally paying (or not paying) its debts as they come due unless

such debts are the subject of a bona fide dispute as to liability or amount, *See* Bankruptcy Code Section 303(h) It is clearly incumbent upon petitioning creditors to undertake due diligence prior to executing such a petition. The consequence of taking this responsibility lightly is set forth in Bankruptcy Code Section 303(i), which enables the Court to assess damage claims and reduce them to judgment in varying degrees, in the event of a dismissal. This responsibility was considered serious enough in this case to warrant a motion by several of the petitioning creditors to withdraw after consultation with their counsel. Indeed, the absence of such due diligence may help explain the difficulty experienced by the Goldmeiers in obtaining the requisite signatures.

24. But of course, as a result of the deliberate obfuscation by counsel to the Current Petitioning Creditors, first in making it highly difficult for Rand's counsel to obtain copies of the signatures, and now, in making the "signing" Current Petitioning Creditors unavailable for deposition until June 4, it is entirely appropriate for Rand's counsel and, Rand would contend, for the Court, to draw a negative inference concerning those signatures.

25. Even assuming, *arguendo*, however, that the "signatures" finally provided to Rand's counsel are real, the Court must consider that, excluding the Goldmeiers and their two affiliated companies, only three (3) signatures have been furnished: Joseph Sandbrook, Chris Leung (for Cookie Jar Entertainment, Inc.) and G Squared Promotion, Ltd. Of these, Mr. Sandbrook's signature is dated March 3, 2010, and therefore has not been re-verified since the Petition Date. (for purposes of the Amended Petition. The claims of G Squared and Joseph Sandbrook, as demonstrated elsewhere in this Motion, made last-minute adjustments to their claims, at the behest of Allen Goldmeier, so as to allegedly comport with Rand's records and therefore appear not to be the subject of a "bona fide dispute".

26. In essence, therefore, there are insufficient petitioning creditors to sustain the Amended Petition, and moreover, counsel to the Current Petitioning Creditors seems to have represented, in filing the Amended Petition with /s/ signatures, that a number of petitioning creditors had signed on by the May 14 deadline when, in fact, they had not.

**POINT TWO**

**THE PETITION WAS PATENTLY FILED IN BAD FAITH AND SHOULD BE DISMISSED, WITH JUDGEMENT FOR DAMAGES UNDER BANKRUPTCY CODE § 303(i) AWARDED TO RAND**

27. As has been pointed out to the Court via the e-mail and deposition exhibits above, a more compelling case for a bad faith filing can scarcely be imagined. Allen Goldmeier, in his deposition testimony, acknowledges plainly and without hesitation, that the decision to file the involuntary petition was made as a consequence of, and immediately following, Judge Driscoll's determination to direct the parties to make further settlement attempts. His e-mail correspondences with potential petitioning creditors make it clear that his goal, together with his brother, was to regain control of Rand, evict Mr. Worksman and take possession of the company premises. It is more than apparent that the filing and the improper solicitation were motivated by malice and need for revenge for slights, perhaps real, but more likely imagined. In either case, this was a two party dispute which was well on its way to being adjudicated in the State Court Action, until the Goldmeiers apparently lost patience with Judge Driscoll, and embarked upon a course of abuse of the bankruptcy process by engaging in overt and impermissible forum shopping. This is no mere interpretation of events; indeed, the best evidence comes from e-mails emanating from the Goldmeiers, in their attempt to line up allies for their vendetta.

28. In attempting to gather support for their crusade against Rand's management, the Goldmeiers did not hesitate to make all sorts of representations, including undertaking full financial responsibility for any damages incurred by parties who agreed to "sign on," and, apparently, indemnifying such parties for unnamed "expenses." In some cases, representations were made that a bankruptcy represented the best hope for a recovery; while in others, creditors were advised that no recovery would be had, but that if the Goldmeiers were successful in ousting management, a new business entity would prove profitable to them with the promise of new business

**A. The Involuntary Petition Was Filed Without The Requisite Approval of Rand's Board of Managers:**

29. It is well settled that the filing of a bankruptcy petition on behalf of a corporate entity is left to the sound discretion of management of involuntary debtor. In In re Source Enterprise, Inc., 392 B.R. 541, 554 (S.D.N.Y. 2008), the District Court held as follows

> [T]he initiation of the [bankruptcy] proceedings, like the run of the corporate activities, is left to the corporation itself, ie. to those who have the power of management." Price v. Gurney, 324 U.S. 100, 104, 65 S.Ct. 513, 89 L. Ed. 776 (1945). State law governs who has the "power of management." In re Stavola/Manson Elec. Co., 94 B.R. 21, 24, (Bankr. D. Conn. 1988); see also In re Am. Globus Corp., 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996). Under New York law, it is the board of directors that has that authority, see In re Jefferson Casket Co., 182 F. 689 (N.D.N.Y. 1910), assuming the bylaws are not in contradiction, see Am. Globus, 195 B.R. at 265; see also Adorn Glass & Venetion Blind Corp. v. Herbst (In re Adorn Glass & Venetion Blind Corp.), 2004 Bankr. LEXIS 2411, at *13-14 (Bankr. S.D.N.Y. 2004)

Id. The filing of a bankruptcy petition is a "special act requiring special authorization and not a general duty of an officer." In re Al-Wyn Food Dist., 8 B.R. 42, 43 (Bankr. M.D. Fl. 1980); Regal Cleaners & Dyers, Inc. v. Merlis, 274 F. 915, 916 (2nd Cir. 1921) (citing In re Jefferson Casket Company, 182 F. 689 (N.D.N.Y. 1910); 6 Collier's (14th ed.) 792)). In keeping with

the same, the Courts of the Second Circuit have held that "[t]here is no presumption of authority in an officer to make and file a voluntary petition in bankruptcy, and he may not do so without the consent of the directors." Regal Cleaners, 274 F. at 916 (2d Cir. 1921) ("It is clear that special authority of the board of directors of a New York corporation is essential to confer authority upon its president to execute and file a petition on its behalf in voluntary bankruptcy..."). "It is well established that the president of a corporation has no general power to file a petition because such an act goes beyond the daily management of corporate affairs; it is a specific act requiring specific authorization." In re Stavola/Manson Electric Co., 94 B.R. 21, 24 (Bankr. D. Conn. 1988)

30. As discussed at length above, Rand was operated under the direction of Mark Worksman, its President and Chief Executive Officer, the Goldmeiers, its two Executive Vice-Presidents, and its Board which consisted of Mr. Worksman and Allen Goldmeier. Rand had always complied with the corresponding corporate formalities and had always included the Goldmeiers in major business decisions. By way of example, in its short history of operations Rand scheduled and held a special meeting to approve the APA and, thereafter scheduled and held a second special meeting of the Board on August 4, 2008 for the purpose of seeking approval to enter into a master purchase order assignment agreement with Transcap Trade Finance LLP (and its successor, Wells Fargo Bank and related agreement). Worksman's Aff., ¶17. Unfortunately, Mr. Goldmeier refused to attend the meeting. Worksman's Aff., ¶18

31. Although the Goldmeiers' employment with Rand was terminated for cause on October 15, 2009, they continue to be officers of Rand and Allen Goldmeier continues to sit on Rand's Board. It should also not be disputed that the Goldmeiers own Petitioning Creditors Century Sports and Executive Importers. As such, the Goldmeiers are

"insiders" of the Debtor who improperly orchestrated the filing of the Involuntary Petition in order to circumvent the requisite approval of Rand's Board. As a result, the entire Involuntary Petition, having been tainted with the Goldmeiers' impropriety, must be dismissed

**B. The Involuntary Petition, Filed For The Bad Faith Purpose of Addressing A Two-Party Dispute, Should Be Dismissed:**

32. "'[T]here is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith.'" Lubow Machine Co., Inc. v. Bayshore Wire Products Corp. (In re Bayshore Wire Products Corp.), 209 F.3d 100, 105 (2d Cir. 2000) (quoting United States Fidelity & Guaranty Co. v. DJF Realty & Suppliers, Inc., 58 B.R. 1008, 1011 (N.D.N.Y. 1986)). What constitutes "bad faith" in the context of an involuntary bankruptcy filing is not defined in the Bankruptcy Code and there is no legislative history addressing the intended meaning. Id. As a result, the courts have developed a number of tests and approaches to reach a determination as to whether an involuntary petition was filed in bad faith. Id.

33. In Lubow Machine, 209 F.3d 100, the Second Circuit considered the many tests employed by the various courts as to bad faith noting

> Some courts have used an "improper use" test, which "finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a "disproportionate advantage" for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum." In re K.P. Enter., 135 B.R. 174, 179 n. 14 (Bankr. D. Me. 1992); see also In re Better Care, Ltd., 97 B.R. 405, 410-11 (Bankr. N.D. Ill. 1989). Other courts have applied an "improper purpose" test, where bad faith exists if the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor. *See, e.g.*, In re Camelot, Inc., 25 B.R. 861, 864 (Bankr. E.D. Tenn. 1982). A third line of cases employs an objective test for bad faith based on "what a reasonable person would have believed." Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.), 61 B.R. 614, 620 (B.A.P. 9th Cir. 1986) (internal quotation marks omitted). Finally, as the Eleventh Circuit has observed, a number of courts have sought to model the bad faith inquiry on the standards set forth in Bankruptcy Rule

> 9011. *See* General Trading Inc. [v. Yale Materials Handling Corp.], 119 F.3d [1485,] 1501-02 [11th Cir. 1997]; In re Fox Island Square Partnership, 106 B.R. 962, 967-68 (Bankr. N.D. Ill. 1989)

Id. at 105-06. Ultimately, the Second Circuit declined to choose among the above-discussed tests and reversed the bankruptcy court's finding of bad faith based upon perceived factual errors. Id. at 106-07.

34. Courts have repeatedly stressed that involuntary proceedings are filed in bad faith when the purpose is for a creditor to gain an unfair advantage over the alleged debtor. By way of example, in In re Better Case, Ltd., 97 B.R. 405 (Bankr. S.D. Ill. 1989) (a case cited by the Second Circuit in Lubow Machine), the court held that "an improper use of the Bankruptcy Code justifying a finding of bad faith will...exist any time a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage. This is especially true when the petitioning creditor could have obtained that advantage in an alternate forum." Id. at 411[7]. And courts have found bad faith when the petition was ill advised or motivated by spite, malice or a desire to embarrass the alleged debtor. Other decisions have looked to whether the creditors' actions were an improper use of

[7] Similarly, in Fraternal Composite Services v. Karczewski, 2004 U.S. Dist. LEXIS 18888, *2-3 (N.D.N.Y 2004), the district court affirmed the bankruptcy court's decision dismissal of a chapter 11 petition on the grounds that it had not been filed in good faith. Although considered in the context of a voluntary chapter 11 petition, in Fraternal Composite a shareholder of the debtor, a corporation, was involved in a state court proceeding whereby the shareholder sought to dissolve the corporation, and at the same time, the debtor's state court action sought to purchase the shareholders stock rather than have it dissolved. Id. at *2. Both parties disagreed as to the value of the stock, however prior to the state court rendering a decision on the matter the debtor filed a voluntary chapter 11 petition. Id. at *3. In response, the shareholder contended that the petition was filed in bad faith. Id. The Bankruptcy Court in Fraternal Composite decided that the debtor had filed its Chapter 11 petition in bad faith, reasoned "...because the state court had not yet issued a judgment on the valuation of the [shareholder's] interest in the corporation, the corporation's intent was to use the bankruptcy process solely as a means to delay, frustrate and re-litigate the state-court issues." Id. When applying this reasoning to the present case, it becomes clear that the Involuntary Petition was not filed in good faith, but rather was knowingly and intentional filed in abject bad faith (constituting, for example not only a two-party dispute but classic forum shopping), and therefore should be dismissed.

the Bankruptcy Code as a substitute for customary collection procedures. *See, generally,* Wavelength, *supra.* No case could fit more neatly into those standards. Here, the Goldmeiers were irritated or impatient with the speed or results of the State Court Action and, by their own admission, sought to deliver the problem into the hands of another Judge and another Court.

35. Any application of the Rule 9011 test would certainly yield an identical result. That test requires investigation of both the facts and the law prior to the signing and submission of a pleading. There is nothing more clear about this case than that the non-insider petitioning creditors conducted no investigation whatsoever and that they relied entirely on bogus promises and misrepresentations by the Goldmeiers. They have done so at their peril.

36. There should be no dispute that the Goldmeiers have zeroed in all of their efforts to re-acquire Rand purely for their own benefit, seize its assets, rid themselves of Mr. Worksman and start up a new company (using the Rand name) so as to avoid their non-compete clause with Rand[8] without having to pay the creditors of Rand any money. Such a "bee line" endeavor is evidenced by many different documents including the October 23, 2007 Letter, multiple e-mails from the Goldmeiers to Mr. Worksman evidencing their intense dislike of Mr. Worksman (*i.e.*, "ill will"); the State Court Action, and the commencement of Landlord/Tenant proceedings (to force the eviction of Rand from the Premises). Having suffered a major setback in the State Court Action, the Goldmeiers concentrated their efforts towards shutting down Rand, believing that Rand could not possibly survive relief in Chapter 11 without the Goldmeiers' allowing use of cash collateral and the Goldmeiers' belief that they could control any creditors' committee that might be appointed in a Chapter 11 case.

[8] On October 27, 2008, counsel for Rand mailed a letter (via Federal Express) to the Goldmeiers reminding them of the restrictive covenants set forth in the April 23, 2007 APA and their respective Employment Agreements precluding them from directly or indirectly owning, managing, operating or participating in any business with Rand for five (5) years.

37. Turning to the instant case, it is obvious that the filing of the Involuntary Petition was merely a means by which the Goldmeiers attempted to obtain an disproportionate advantage in connection with the two-party State Court Action and not for the benefit of the creditors of the Alleged Debtor. Indeed, if an Order for Relief under Chapter 7 is entered and Rand is liquidated, it is likely that any proceeds of the estate will be paid over to Century Sports on account of the Subordinated Note and not to any unsecured creditors of Rand. Rand is in daily communication with its creditors and is working to resolve all defaults and to explain its inability to pay in light of the tremendous administrative expenses to the estate in connection with the filing of the Involuntary Petition.[9]

**C. <u>This Court Should Abstain From Exercising Jurisdiction Over This Two-Party Dispute:</u>**

38. For reasons similar to those discussed above with regard to the Involuntary Petition having been filed in bad faith, this Court should abstain from entertaining the Involuntary Petition. With regard to abstention, §305(a)(1) of the Bankruptcy Code provides, in pertinent part:

> (a) The court, after notice and a hearing, may dismiss a case under this title or may suspend all proceedings in a case under this title, at any time if –
>
> > (1) the interests of creditors and the debtor would be better served by such dismissal or suspension...

39. "'The courts that have construed §305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under §305(a)(1) only in the situation where the court finds that both

[9] Rand's arguments in this regard are made without prejudice to its right to seek an award of costs, attorneys' fees, compensatory and/or punitive damages against the Petitioning Creditors pursuant to §303(i) of the Bankruptcy Code. All such rights are hereby expressly reserved by Rand.

'creditors and the debtor' would be 'better served' by a dismissal.'" In re Monitor Single Lift I, Ltd., 381 B.R. 455, 462 (Bankr. S.D.N.Y. 2008) (quoting In re Eastman, 188 B.R. 621, 624 (B.A.P. 9th Cir. 1995)). The moving party bears the burden of demonstrating that the interests of both the debtor and its creditors would benefit from dismissal. Id. (*citing* In re Globo Comunicacoes e Participacoes S.A., 317 B.R. 235, 255 (S.D.N.Y. 2004). The decision as to whether abstention is appropriate under §305(a)(1) of the Bankruptcy Code is committed to the court's discretion and should be made on a case-by-case basis. In re Compania de Alimentos Fargo, S.A., 376 B.R. 427, 433 (Bankr. S.D.N.Y. 2007); Matter of Fitzgerald Group, 38 B.R. 16, 17 (Bankr. S.D.N.Y. 1983).

40. Bankruptcy courts have considered the following seven factors in determining whether abstention under §305(a)(1) of the Bankruptcy Code is warranted in a given case:

> (1) the economy and efficiency of administration;
>
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
>
> (3) whether federal proceedings are necessary to reach a just and equitable solution;
>
> (4) whether there is an alternative means of achieving an equitable distribution of assets;
>
> (5) whether the debtor and its creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
>
> (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
>
> (7) the purpose for which bankruptcy jurisdiction has been sought.

*See, e.g.*, Monitor, 381 B.R. at 464-65; Mountain Dairies, 372 B.R. at 625; In re Paper I

Partners, L.P., 283 B.R. 661, 678 (Bankr. S.D.N.Y. 2002). Not all factors are to be given equal weight in every case. Monitor, 381 B.R. at 465.

41. Turning to the instant case, it is respectfully submitted that this Court should abstain from exercising jurisdiction of the Involuntary Petition. As discussed at length above, the Goldmeiers had commenced the State Court Action which was proceeding efficiently. It was only after Judge Driscoll issued his decision of February 18, 2010 ruling against the Goldmeiers that the Goldmeiers took steps toward and ultimately filed the Involuntary Petition against Rand so as to protect their own interests and not those of Rand's other creditors.

**D. The Manner of Solicitation Was Improper And Represents Another Manifestation of Bad Faith:**

42. Specifically, the following represent some of the dubious solicitation methods employed by the Goldmeiers:

**(i). G Squared Promotions, Ltd.:**

43. In his deposition, Allen Goldmeier was asked about his solicitation of G Squared Promotions, Ltd., relating to the Amended Involuntary Petition and his responses were as follows:

> Q.. Your testimony today is that you were aware of only two changes and that is the claim of Executive Importers, LLC and to your claim?
> A. In fact, I understand that one of the petitioners is increasing their claim amount.
> Q. Who would that be?
> A. That would be G Squared.
> Q. How much is he increasing his amount to?

A. I think he petitioned for approximately 5,000 and his claim is being revised to 38,000, because it was discovered that he never received royalty reports of shipments that were made. So now that he understands that there were shipments made of his license, the revised amount is the higher amount.

Q. Are there any e-mails that exist between you and G Squared in which you discussed the increased amount?

A. I sent him last night.

Q. What did that e-mail say?

A. It says that we found out that Worksman owes you more money than we petitioned. One of the Worksman tricks is not to submit royalty reports to disclose the obligations that he owes this way he shows -- he leads the licensor to believe they're owed a lesser amount than what is actually owed.

It's a cheating trick of his. Don't submit the report that shows you owe them the money and if you don't submit it then they won't chase you to pay the obligation; it's a trick.

Q. Did G Square Promotion Limited tell you that their claim was wrong?

A. No, they weren't aware that it was wrong. They were being tricked by Worksman because Worksman didn't submit the royalty report to him.

Q. How did they get a copy of the royalty report that showed a greater amount owed; was that provided by you either.

A. No, I haven't received a copy either. Although I do know there were shipments made and obviously Worksman didn't provide me a royalty report that showed he owed him another $30,000 plus.

Q. So how did G Squared become knowledgeable that they were owed increased royalties of $38,000?

A. I brought it to their attention that Worksman withheld the royalty report, that he wasn't truthful in his reporting. I said I'm going to tell you there are shipments that were

made before the end of this year, and
calculating the royalties due on those shipments
he actually owes you more money than you
petitioned.

Q. And you solicited them to file an
amended claim for the increased amount; is that
correct?

A. I told them their petitioned claim
is incorrect, it's understated.

Q. And they agreed with you it was
understated?

A. I didn't get --

MR. KUSHNER: They signed a
petition, Doug.

Q. Which would make it obvious. They
agreed that it was understated?

A. I didn't see his reply but I
understand, I heard that he's revising his
petition to the corrected amount.

Goldmeier TR. pp. 211 (commending on line 18) through 214 (ending on line 21) (*Exhibit "B")*.

44. We can see from this exchange that Goldmeier was directly instrumental in promoting an adjustment of this claim for purposes of the Amended Petition for the express purpose of ensuring that the claim alleged therein was consistent with the figure that Rand would have listed in its own books and records. The purpose of this, of course, was to make certain that, whatever G Squared might have shown as due in its own account receivable balance, there would be no "bona fide dispute," once its figures were artificially matched up to Rand's.

**(ii). <u>Joseph Sandbrook</u>:**

45. Furthermore, in the same deposition, at p. 230, counsel for the Current Petitioning Creditors represents, on the record, that no e-mails were exchanged with Joseph

Sandbrook.[10] In fact, an e-mail dated March 3, 2010 was produced, in which Sandbrook states that he is owed $19,800 by Rand. Mysteriously, however, the amount which appears in the Amended Petition was mysteriously reduced to $18,500, which is the amount listed in Rand's books and records. Can it now possibly be denied that this claim is subject to bona fide dispute, when clearly Sandbrook believes his claim to be higher than listed on the Petition?

**(iii). Matang Gonzales:**

46. As the Court is aware, Mr. Gonzales has now sought Court approval to withdraw from the Petition. However, in his March 3, 2010 e-mail, Allen Goldmeier states as follows: "By you signing the petition I am covering your claim under the cost of my attorney and also covering if they contest it." And "[o]nce again, pls check with your attny. to help you decide if you would like to sign back and join in under my umbrella..." See *Exhibit "F"* This offer, aside from being a completely improper solicitation is directly contrary to Goldmeier's sworn testimony in his deposition, in which he firmly denies any such arrangements with any creditors. See Transcript pp.226-227., *Exhibit "B"*.

**(iv). Louis Umana**

47. Louis Umana of LV International was solicited as well. Though no paper record of how that solicitation took place was made available to Rand's counsel, we do know that on March 4, Umana e-mailed Steven Goldmeier with the following astonishing communication: "Stevens (sic): I spoke with Juan Carlos and hes (sic) telling me this. He said that when they were in N.Y in December, that you promised him to paid (sic) for all expenses for all time they were there and not worry s. (sic) And also is telling me he dose'nt want

[10] Throughout the deposition, including on pp. 228-229, Goldmeier alleges that his e-mails (he does not say which ones), had been "erased", "purged" and/or "disappeared". This, coming from the same individual who claimed earlier in the examination that he does not know how to manage e-mails, and that his wife handles all such matters. See Transcript at pp. 35-44.

nothing w/Lawyers all he wants is hes money I think hes talking about expenses. (sic)" See Petitioning Creditors' Bates Page. No. 3673, *Exhibit "G"*.

48. A casual reading of this communication suggests the rather overt promise of consideration to creditors for cooperation. Again, in the absence of a chain of correspondence preceding this communication, Rand's counsel is left to speculate as to further discussions regarding these matters.

49. In summary, therefore, the pattern of solicitation outlined above is indicative of deceit, misstatement and promises not entirely defined in the record in exchange for participation in an involuntary petition. And yet, for all that scheming and effort, the number of petitioning creditors, who are not insiders and whose claims are not subject to bona fide dispute remains insufficient!

## POINT THREE

## THE INVOLUNTARY PETITION SHOULD BE DISMISSED AS THE CLAIMS OF THE PETITIONING CREDITORS ARE THE SUBJECT OF A BONA FIDE DISPUTE AS TO LIABILITY AND / OR AMOUNT

50. Section 303 of the Bankruptcy Code governs involuntary petitions and provides, in pertinent part, as follows:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title –
>
> > (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $13,475 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims
> >
> > (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under

> section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $13,475 of such claims

11 U.S.C. §303(b). The petitioning creditors have the burden of proving all of the statutory requirements of §303 of the Bankruptcy Code. *See, e.g.*, In re Palace Oriental Rugs, Inc., 193 B.R. 126, 128 (Bankr. D. Conn. 1996).

51. The phrase "as to liability *or amount*" was added to §303(b)(1) and (h)(1) following the phrase "bona fide dispute" by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, §§1234(a)(1)(A) and (a)(2), 119 Stat. 23 (April 20, 2005). The amendment was intended to prevent creditors from using the bankruptcy process as a means of coercing alleged debtors to pay legitimately disputed debts. *See* Mountain Dairies, 372 B.R. at 634-35 (courts are wary of encouraging two party disputes to use the bankruptcy system as a quick resolution to their disputes)

52. Prior to the amendment, a dispute concerning the amount of the claim was not a "bona fide dispute" as to the entire claim, under §303(b)(1). In re Focus Media, Inc., 378 F.3d 916, 926 (9th Cir. 2004) ("a dispute as to the amount of the claim gives rise to a bona fide dispute only when: (1) it does not arise from a wholly separate transaction (2) netting out the claims of the debtors could take the petitioning creditors below the amount threshold of §303") (internal quotation marks omitted). BDC 56, 330 F.3d at 120 (bona fide dispute exists "where a claim for offset arises out of the same transaction and is directly related to the creditor's underlying claim, and, if valid, could serve as a complete defense to that claim"). The 2005 amendments presumably eliminated the second part of the test. *See* 2 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* P 303.03[2][b], at 303-30 (15th rev. ed.

2006). As a result of the amendment, *any dispute*[11] regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a bona fide dispute. Id.

53. As discussed above, in considering Rand's request for summary judgment that the Petitioning Creditors' claims are subject to bona fide disputes as to liability or amount, this Court is not required to resolve the merits of the alleged dispute, but simply must determine whether a dispute exists. *See, e.g.*, Platinum Financial Services Corp. v. Byrd (In re Byrd), 357 F.3d 433, 437 (4th Cir. 2004). As set forth in detail in Paragraphs 32 through 63 of the Worksman Aff., and the extensive documentary exhibits attached thereto, each of the Petitioning Creditors' claims was and continues to be disputed by Rand. Again, the mere existence of these disputes, regardless of who might ultimately prevail on the merits if tried, is sufficient to warrant the dismissal of the Involuntary Petition

[11] By way of example, a dispute would exist if a Petitioning Creditor asserted it was owed $5,000 and an alleged debtor's books and records reflected $1,000 as owed, or if a Petitioning Creditor asserted it was owed $1,000 and the alleged debtor's books and records reflected $5,000. The definition of the word "dispute" was meant to read broadly.

**CONCLUSION**

54. Based upon the foregoing, it is respectfully submitted that Rand is entitled to judgment in its favor dismissing the Involuntary Petition and, therefore, the Motion should be granted in its entirety.

Dated: New York, New York
May 24, 2010

**PICK & ZABICKI LLP**
Counsel to the Alleged Debtor

By:

Douglas J. Pick
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000