Douglas J. Pick
Eric C. Zabicki
**PICK & ZABICKI LLP**
Counsel to the Alleged Debtor
369 Lexington Avenue, 12th Floor
New York, New York 10017
(212) 695-6000
dpick@picklaw.net

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

|  |  |
|---|---|
| In re: | Chapter 7 (Involuntary)<br>Case No. 10-71497 (AST) |
| RAND INTERNATIONAL LEISURE<br>PRODUCTS, LLC, |  |
|  | **ALLEGED DEBTOR'S** |
| Debtor. | **PRE-TRIAL MEMORANDUM** |

----------------------------------------------------------x

   Rand International Leisure Products, LLC, by its counsel, Pick & Zabicki, LLP

("Rand" or "Alleged Debtor"), hereby submit this Pre-Trial Memorandum (the "Memorandum")

in accordance with the scheduling order dated April 27, 2010:

**A.**  **Names, Addresses, and E-Mail Addresses of each Possible Witness**

   1.  For the Petitioning Creditors

     (a)  Allen Goldmeier
        1 Blueberry Lane
        Bay, NY 11771
        allengoldmeier@aol.com

     (b)  Steven Goldmeier
        16 Turnberry Lane
        Plainview, NY 11803
        sbcycles@aol.com

     (c)  Ellen Liu, President
        Sales Chief Ent. (Hong Kong) Co. Ltd.

11f,-3, No., 21, Sec.6
Zhongxiao E. Rd., Nangfang District
Taibaie 115 Taiwan
Tpe-ellen@saleschief.com.tw

(d)    Joseph Sandbrook
199-12 19th Avenue
Whitestone, NY 11357
JSandbrook@nyc.rr.com

(e)    George Gross
G Squared Promotion Ltd.
7620 Yonge Street, Unit 300
Thornill, Ontario
L4J 1V9, Canada
jj@gsquaredlicensing.com
george7684grossjr@rogers.com

(f)    Executive Importers, LLC
1 Blueberry Lane
Oyster Bay, NY  11771
Attn:  Allen Goldmeier
allengoldmeier@aol.com

(g)    Executive Importers, LLC
1 Blueberry Lane
Oyster Bay, NY  11771
allengoldmeier@aol.com
sgcycles@aol.com

(h)    Century Sports, Inc.
1 Blueberry Lane
Oyster Bay, NY  11771
allengoldmeier@aol.com

(i)    G Squared Promotion Ltd.
7620 Yonge Street, Unit 300
Thornill, Ontario
L4J 1V9, Canada
Attn:  George Gross
jj@gsquaredlicensing.com
george7684grossjr@rogers.com

(j)    KKG, Inc. d/b/a Kendal King Group

               1925 Central
               Kansas City, MO  64108
               Attn:  Scott King
               sking@kendalking.com

(k)    L.V. International
       6343 Lincoln Avenue, Unit J-2
       Buena Part, CA  90620
       Attn:  Louis Umana
       LouisUmana@aol.com

(l)    Mark Long
       Vice President
       Wells Fargo Bank N.A.
       119 West 40th Street
       New York, NY  110018
       Attn:  Legal Department

(m)    Mark Goldberg
       Raphael Sanders Goldberg Nikpour
       100 Crossways Boulevard
       97 Frolich Farm Boulevard
       Woodbury, NY  11791

(n)    Marvel Entertainment LLC
       417 Fifth Avenue
       New York, NY  10016

2.   <u>Rand's Witnesses</u>

(a)    Mark Worksman
       c/o Pick & Zabicki, LLP
       369 Lexington Avenue, 12th Floor
       New York, NY  10017
       (212) 695-6000

(b)    Stephan M. Pinsly
       Getzler Henrich & Associates LLC
       295 Madison Avenue, 7th Floor
       New York, NY  10017
       (212) 697-2400

(c)    Edward S. Rudofsky, Esq.

Zane & Rudofsky
601 West 26th Street
New York, NY  10001
(212) 245-2222

(d)    Leslie Turbowitz
c/o Pick & Zabicki, LLP
369 Lexington Avenue, 12th Floor
New York, NY  10017
(212) 695-6000

**B.    List of Witnesses Whose Testimony is to
Be Presented by Means of Deposition**

1.    <u>For the Petitioning Creditors</u>

(a)    Mark Long, Vice President
Wells Fargo Bank, N.A.

Rand would object to any witness' testimony presented by deposition as improper.

2.    <u>For the Alleged Debtor</u>

Rand does not expect to present the testimony of any witness (other than Steven Goldmeier) by means of a Deposition at this time, but reserves the right to do so as may be permitted by the Court or by Rule and/or for purposes of impeachment or rebuttal.

**C.    <u>A list of Expert Witnesses</u>**

1.    <u>For the Petitioning Creditors</u>

Petitioning Creditors do not intend to call any witness as any expert at this time, but reserves the right to do so as may be permitted by the Court

2.    <u>For the Alleged Debtor</u>

Rand does not intend to call any witness as an expert at this time, but reserves the right to do so as may be permitted by the Court or by rule.

**D.    <u>Document and Exhibit Identification</u>**

1.    <u>For the Petitioning Creditors</u>

(a)  Declaration of Allen Goldmeier

4

      (b)  Declaration of Steven Goldmeier
      (c)  Declaration of Sales Chief
      (d)  Declaration of G Squared
      (e)  Declaration of Kendal King
      (f)  Declaration of L.V. International
      (g)  Declaration of Joseph Sandbrook

2.   <u>For the Alleged Debtor</u>

<u>Witness Affidavits</u>

(a)    Affidavit of Mark Worksman in Lieu of Direct Testimony for Trial on Contested Involuntary Chapter 7 Petition, sworn to on June 8, 2010;

(b)    Affidavit of Stephan M. Pinsly in Lieu of Direct Testimony for Trial on Contested Involuntary Chapter 7 Petition, sworn to on June 7, 2010;

(c)    Affidavit of Sean Smith in Lieu of Direct Testimony for Trial on Contested Involuntary Chapter 7 Petition, sworn to on June 8, 2010;

(d)    Affidavit of Edward S. Rudofsky in Lieu of Direct Testimony for Trial on Contested Involuntary Chapter 7 Petition, sworn to on June 8, 2010;

(e)    Affidavit of Leslie Turbowitz in Lieu of Direct Testimony for Trial on Contested Involuntary Chapter 7 Petition, sworn to on June 8, 2010;

**<u>Trial Exhibits</u>**

      Ex. A – Operating Agreement of Rand International Acquisition I LLC
      Ex. B – Asset Purchase Agreement
      Ex. C – Written Consent to Action of the Managers and Sole Member in Lieu of Special Meeting of Rand International Acquisition I LLC
      Ex. D – Rand International Acquisition I LLC Eight Percent (8%) Senior Subordinated Secured Note
      Ex. E – Guaranty
      Ex. F – Power of Attorney
      Ex. G – Pledge and Escrow Agreement
      Ex. H – Credit and Security Agreement By and Between Rand International Acquisition I LLC and Wells Fargo Bank, National Association
      Ex. I – Subordination Agreement
      Ex. J – Employment Agreement By and Between Rand International Acquisition I LLC and Allen Goldmeier
      Ex. K - Employment Agreement By and Between Rand International Acquisition I LLC and Steven Goldmeier

Ex. L – Transcript of Examination Before Trial of Allen Goldmeier

Ex. M – Voting Agreement

Ex. N – Summons With Notice and Verified Complaint in State Court Action

Ex. O – Legal Agreement on Behalf of Steven Goldmeier and Allen Goldmeier, Mark Worksman, Rand International and Executive Importers

Ex. P – Notice of Special Meeting of Board of Managers of Rand International Leisure Products, LLC

Ex. Q – E-mail Dated February 14, 2009 From Allen Goldmeier to Mark Worksman

Ex. R – Letter Dated October 23, 2009 From Gary M. Kushner, Esq. to Rand International Acquisition I LLC, Meltzer, Lippe, Goldstein & Breitstone , LLP and Mark A. Worksman

Ex. S – Affidavit of Mark Worksman, sworn to on February 1, 2010, and Exhibits Thereto Submitted in State Court Action

Ex. T - Affidavit of Stephan M. Pinsly, sworn to on February 1, 2010, and Exhibits Thereto Submitted in State Court Action

Ex. U – Decision and Order of the Hon. Timothy S. Driscoll, J.S.C., Entered on February 25, 2010

Ex. V – Settlement Agreements (4) Between Rand International Leisure Products LLC and Bargain Furniture, Inc., Design Edge, Inc., Matang Gonzales and CMS Partners, Ltd. and Dalton Club Marketing Services, Inc. d/b/a Club Marketing Services, Inc.

Ex. W – Various E-mails Between Allen Goldmeier and Representatives of Sales Chief Ent. (Hong Kong) Co., Ltd.

Ex. X – E-mail Dated May 13, 2010 From Allen Goldmeier to George Gross

Ex. Y – E-mail Dated March 3, 2010 From Allen Goldmeier to Matang Gonzales

Ex. Z – E-mail Dated May 13, 2010 From Allen Goldmeier to Tim Bellows

Ex. AA – Pleadings and Documents Regarding Eviction Proceeding

Ex. BB – Voucher History Report and Documents Regarding Allen Goldmeier

Ex. CC – Voucher History Report and Documents Regarding Steven Goldmeier

Ex. DD – License Agreement Between HIP Designs Limited and Rand International

Ex. EE – Sub-License Agreement Between HIP Designs Limited, G Squared Promotion Ltd. and Rand International

Ex. FF - Voucher History Report and Documents Regarding G Squared Promotion Ltd.

Ex. GG – E-mail Dated May 13, 2010 From Allen Goldmeier to George Gross

Ex. HH – Voucher History Report and Documents Regarding KKG, Inc. d/b/a Kendal King Group

Ex. II – Voucher History Report Regarding Louis Umana/L.V. International

Ex. JJ – E-mail Dated February 3, 2010 From Mark Worksman to Louis Umana

Ex. KK – E-mail Dated March 4, 2010 From Louis Umana to Steven Goldmeier

Ex. LL – Various E-mails Between Allen Goldmeier and Louis Umana

Ex. MM – Invoices of Sales Chief Ent. (Hong Kong) Co., Ltd.

Ex. NN – E-mails and Documents Regarding Invoices of Sales Chief Ent. (Hong Kong) Co., Ltd.

Ex. OO – Invoices of Joseph Sandbrook

Ex. PP – Voucher History Report Regarding Joseph Sandbrook

Ex. QQ – Various E-mails Between Allen Goldmeier and Joseph Sandbrook

Ex. RR – Voucher History Report and Documents Regarding Bargain Furniture Inc.

Ex. SS – Collection Agreement and Lawsuit Authorization Attachment Regarding Cookie Jar Entertainment (USA) Inc.

Ex. TT – Release Regarding Cookie Jar Entertainment (USA) Inc.

Ex. UU – E-mail Dated March 26, 2010 From Mark Worksman to Keith Kramer, Esq.

Ex. VV – E-mail Dated March 3, 2010 From Eric Horowitz, Esq. to Gary Kushner, Esq.

Ex. WW – E-mail Dated February 25, 2010 From James E. Zane, Esq. to Mark Worksman.

Ex. XX – [For Impeachment Purposes Only] E-mails Between Allen Goldmeier and Potential Petitioning Creditors

**E.**    **Statement of Objection to Admissibility of a Deposition/Affidavit Testimony**

1.    <u>For the Petitioning Creditors</u>

Separately filed.

2.    <u>For the Alleged Debtor</u>

Separately filed.

**F.**    **Exchange of Exhibits**

On August 8, 2010, Rand, by its counsel, sent by overnight mail, two (2) Trial Exhibit Books and copies of all Trial Affidavits. Counsel for the Petitioning Creditors refused to overnight a Trial Exhibit Book and its Trial Affidavits insisting that this Court's Order only provided for e-mail of its 40 exhibits and the Trial Affidavits.

### G.    Admitted Facts

1.    On April 12, 2007, the Articles of Organization of Rand International Acquisition I LLC were filed with the New York State Department of State.

2.    The purpose for the formation of Rand International Acquisition I LLC was to acquire substantially all of the assets of Rand International Leisure Products, Ltd. ("Old Rand"), together with substantially all of the assets of Old Rand's affiliates, Ross Bicycles U.S.A., Ltd., A to Z Freight Forwarders Inc. and North America Cycles Ltd.

3.    Each of the Sellers was and continues to be owned by Allen Goldmeier and Steven Goldmeier.

4.    On May 1, 2007, Rand International Acquisition I LLC changed its name to Rand International Leisure Products LLC, which is the alleged debtor herein.

5.    On April 27, 2007, Old Rand (*i.e.*, Rand International Leisure Products, Ltd.) changed its name to Century Sports, Inc. ("Century Sports").

6.    Pursuant to the *Operating Agreement of Rand International Acquisition I LLC* (the "Operating Agreement"), Rand was to be managed by a two member Board of Managers consisting of Allen Goldmeier and Mark Worksman.

7.    The Operating Agreement provides, in pertinent part, as follows:

Mark Worksman shall have two (2) votes with respect to any matters that come before the Board.  Allen Goldmeier shall have one (1) vote with respect to any matters that come before the Board.

* * *

At all meetings of the Board, the Managers having a  majority of the votes shall constitute a quorum for the transaction of business and, unless otherwise set forth herein, the vote of a majority of the Managers entitled

8

to vote at any meeting at which there is a quorum shall be the act of the Board.

8.      The Operating Agreement provides that regular meetings of the Board shall be held at such times and at such places as shall be fixed by approval of the Board and further provided that special meetings of the Board may be called at any time by any Manager for any purpose.

9.      The Operating Agreement grants the Board of Managers the authority to appoint officers of Rand and provides as follows:

> The Board shall be empowered to appoint officers (the "Officers") who may be responsible for all day-today operations of the Company, subject to the supervision of the Board and the terms and conditions of this Agreement and any employment agreement with such Officers.

10.     The Operating Agreement provided that the following individuals shall serve as the officers of Rand: (a) Mark Worksman - President and Chief Executive Officer; (b) Allen Goldmeier - Executive Vice-President; and (c) Steven Goldmeier - Executive Vice-President.

11.     Allen Goldmeier has never resigned from the Board of Managers of Rand.

12.      The *Asset Purchase Agreement* (the "APA") was executed by Rand and the Sellers on or about April 23, 2007.

13. The *Written Consent to Action of the Managers and Sole Member In Lieu of a Special Meeting of Rand International Acquisition I LLC* was executed by Allen Goldmeier and Mark Worksman as the Managers of Rand on or about April 23, 2007.

14. The purchase price under the APA consisted of: (a) $6,912,000 in cash; (b)

an *Eight Percent (8%) Senior Subordinated Secured Note* (the "Subordinated Note") in the amount of $3,000,000 in favor of Old Rand; and (c) the assumption of all "Liabilities": (i) arising under all "Assumed Contracts", (ii) of all "Employee Benefit Plans" and (ii) "relating to each Seller's Business".

15.    Pursuant to a *Security Agreement* dated April 23, 2007, Old Rand was granted a lien against all of Rand's existing and after-acquired assets.

16. On April 17, 2007, Old Rand filed a UCC-1 Financing Statement with the New York State Department of State regarding its security interest in the assets of Rand.

17. On or about April 23, 2007, Mark Worksman executed a *Personal Guaranty* and a *Power of Attorney* in favor of Old Rand and Mark Worksman's 100% membership interests in Rand was placed in escrow pursuant to a *Pledge and Escrow Agreement*.

18.    To finance its acquisition of the assets of Old Rand, and with the assistance of Allen and/or Steven Goldmeier (together, the "Goldmeiers"), Rand obtained two loans from Wells Fargo Bank pursuant to a *Credit and Security Agreement* between Rand and Wells Fargo dated April 23, 2007 (the "Wells Fargo Credit Agreement").

19.    One of the loans consisted of a revolving credit line for up to the principal amount of $10,000,000 (the "Wells Fargo Revolving Note"), a substantial portion of which Rand used to fund the $6,912,000.00 cash portion of the purchase price.

20.    The other loan consisted of a term note for the principal amount of $2,000,000 (the "Wells Fargo Term Note" which Rand utilized for working capital and was being repaid by Rand in monthly installments of $55,555.99 beginning May 1, 2007.

21.    Pursuant to the Wells Fargo Credit Agreement, Rand granted Wells

Fargo Bank a lien on a security interest in all of its existing and after-acquired assets.

22.    A *Subordination Agreement* (the "Subordination Agreement") was executed by Old Rand on or about April 23, 2007 pursuant to which it agreed to subordinate its security interest in Rand's assets to Wells Fargo Bank and further agreed to defer repayment of principal and to accept interest-only payments on the Subordinated Note until Rand satisfied the Wells Fargo Term Note.

23. The Subordination Agreement also limited Old Rand's ability to file a lawsuit in connection with the Subordinate Note as follows:

> Action on Subordinated Indebtedness.  Except as otherwise permitted herein, the Subordinated Creditor will not commence any action or proceeding against the Borrower or Guarantor to recover all or any part of the Subordinated Indebtedness, or join with any creditor (unless the Senior Lender shall so join) in bringing any proceeding against the Borrower or Guarantor under any bankruptcy, reorganization, readjustment of debt, arrangement of debt receivership, liquidation or insolvency law or statute of the federal or any state government, or take possession of, sell, or dispose of any Collateral, or exercise or enforce any right or remedy available to the Subordinated Creditor with respect to any such Collateral, unless and until the Senior Lender Indebtedness has been paid in full.

24. Among the provisions of the APA were covenants restricting the Goldmeiers' ability to engage in enterprises competing with Rand and the APA provides, in pertinent part as follows:

> Non Competition; Non-Solicitation.  Subject to the terms of the Employment Agreements, for a period of five (5) years from and after the Closing Date no Restricted Party will, directly or indirectly, through any Person:
>
> (a)    own, manage, operate, control or participate in the ownership, management, operation or control of, or be connected as a stockholder, lender, partner, or joint venturer in any business or organization any part of which, competes with the Businesses of any of the Sellers now or during the three years prior to the Closing Date in any geographic area in which any of the Sellers

conducts that Business as of the Closing Date (the "Restricted Area"); provided, however, that no owner of less than 5% of the outstanding stock of any publicly traded corporation shall be deemed to violate the terms hereof solely by reason thereof;

(b)      induce or attempt to induce any customer, supplier, licensor, licensee, distributor or other business relation of any of the Sellers from maintaining the same business relationships with Buyer after the Closing Date as were maintained with such Seller prior to the Closing Date; or

(c)      solicit or cause or authorize, directly or indirectly, to be solicited for employment for or on behalf of himself or any other person, any person who is an employee of any of the Sellers or had been an employee of any of the Sellers at any time during the two years prior to the Closing Date or during the six months prior to the solicitation.

The Buyer shall be entitled, in addition to any other right or remedy it may have, at law or in equity, to an injunction, without the posting of any bond or other security, enjoining or restraining a Seller from any violation or threatened violation of Sections 5.13 or 5.14.  If any of the restrictions contained in Sections 5.13 or 5.14 shall be deemed to be unenforceable by reason of the extent, duration or geographical scope thereof, or otherwise, then the court making such determination shall have the right to reduce such extent, duration, geographical scope or other provisions hereof and, in its reduced form, such provisions shall then be enforceable in the manner contemplated hereby.  The prevailing party in any action or proceeding to enforce the restrictions set forth herein will be entitled to an award of reasonable attorneys' fees and expenses in connection with such action or proceeding.

25. Each of the Goldmeiers' Employment Agreements (as hereinafter defined) contains substantially identical non-competitive/non-solicitation provisions to those in the APA, but which run for a period of five (5) years "after the expiration of the Term" of the Employment Agreements, *i.e.*, three years from the execution thereof.

26. The APA incorporated certain protections and controls for the sole benefit of Goldmeiers, including, for example, the following provisions:

Protective Covenants.  Until all principal, interest, and other amounts due under the Promissory Note have been indefeasibly paid in full, and so long as a Shareholders' Phantom Equity Rights are outstanding or amounts payable with respect thereto remain unpaid, Buyer will comply with  the following requirements, unless the Shareholders shall otherwise consent in writing (capitalized terms used in this Section 5.15 that are not otherwise defined in this Agreement shall be have meanings ascribed to them in the Credit Agreement). Following payment of the Promissory Note and payment of all amounts outstanding with respect to a Shareholder's Phantom Equity Rights, the consent of such Shareholder shall no longer be required.

*  *  *

Salaries.  Buyer will not pay excessive or unreasonable salaries, bonuses, commissions, consultant fees or other compensation; or increase the salary, bonus, commissions, consultant fees or other compensation of any Director, Officer or consultant, or any member of their families by more than ten percent (10%) in any one year, either individually or for all such persons in the aggregate, or pay any such increase from any source other than profits earned in the year of payment.  Without limiting the foregoing, (a) Buyer will not, directly or indirectly, pay Worksman salary, bonuses, commissions, fees, or other compensation (collectively, "Compensation") which, in the aggregate, (i) exceeds $200,000 in any fiscal year of buyer, or (ii) during the term of each Employment Agreement, exceeds the salary paid to each Shareholder pursuant to such Shareholder's employment Agreement, and (b) Buyer will not, directly or indirectly, pay Worksman any Compensation if and for as long any payment under the Promissory Note is past due (without regard to any cure or grace period including, for avoidance of doubt, the payment extension period provided in Section 1(a)(iii) of the Promissory Note)

27. The *Employment Agreements* between Rand and the Goldmeiers were executed on or about April 23, 2007 (together, the "Employment Agreements").

28. The Employment Agreements provide each of the Goldmeiers with, *inter alia*, the right to receive a payment from Rand equal to fifteen (15%) percent (a total of 30%) of the "Stated Value" of Rand, payable upon the occurrence of a "Capital Event" or a "Change in Control", as those terms are defined in the Employment Agreements.

13

29. The Employment Agreements define this financial interest as a "Phantom Equity Interest" in Rand. The Employment Agreements expressly precluded Rand from making any distributions to the "members" of Rand without first obtaining the permission of the Goldmeiers.

30. Pursuant to the *Voting Agreement* (the "Voting Agreement") between Rand and the Goldmeiers dated as April 23, 2007, the Goldmeiers were granted, among other things, input into Rand's business decisions, access to all financial information, the right to appoint either Steven Goldmeier or Allen Goldmeier to the Board of Managers and the right to receive all notices of any meeting of the Board. Worksman

31. By way of the complaint filed in the subsequent State Court Action (defined below) which was verified by Allen Goldmeier, the Goldmeiers stated as follows:

> The Voting Agreement was intended to ensure that the Goldmeiers would have the opportunity, through their designee to Rand's Board of Managers, to participate in the process of making important and critical decisions concerning Rand's business activities and to have access to financial information concerning Rand and its dealings with Wells Fargo, critical suppliers and other trade creditors, as well as all facets of the ongoing business activities.

32. The Goldmeiers are the principals of Executive Importers, LLC ("Executive Importers") which owns the real property and improvements located at 51 Executive Boulevard, Farmingdale, New York (the "Premises"), where Rand's business and assets are located.

33. Sometime in 2008, Allen Goldmeier stopped working at Rand's business Premises and insisted that he be permitted to work out of his home, refusing to return to his office or to come to the business Premises.

34. In August, 2009, and in order to secure a license with Marvel which the Goldmeiers had negotiated, the Goldmeiers agreed to advance certain amounts on Rand's behalf.

14

35.    Pursuant to the *Legal Agreement on Behalf of Steven and Allen Goldmeier, Mark Worksman, Rand International and Executive Importers* dated August 25, 2009 (the "August 25, 2009 Loan Agreement"), the Goldmeiers paid the sum of $500,000.00 directly to Marvel on behalf of Rand.

36.    The August 25, 2009 Loan Agreement provided, among other things, as follows:

(a)    Rand was to repay the loan in two installments of $250,000 on October 25, 2009 and on November 25, 2009 at 12% interest.

(b)    "The Goldmeiers equity in Rand will revise from 30% to 40%"

(c)    "Rand stops utilizing and paying for any services of Jonathan Cohen as of two weeks from the date of this Agreement"; and

(d)    The Company must "begin operating via the Board of Director approach as already agreed in the Buy/Sell."

37.    On February 14, 2009, Allen Goldmeier sent an e-mail to Mark Worksman which provided as follows:

From:    C1219@aol.com
Sent:    Saturday, February 14, 2009 1:46 P.M.
To:      mworksman@randinternational.com
Cc:      ppergament@randinternational.com;
sgoldmeier@randinternational.com; agoldmeier@randinternational.com
Subject:        "My Lucky Star"

Mark,

You saved my life!  The Goldmeiers owe you for the shoes we wear. Where would I be without you? Probably still in debt at $22 Million, if not for you.  Please let me be your slave and I'll crawl through the mud for you forever.

Gee, if you could only do for yourself what you've done for the Goldmeiers then you'd really have a story to tell!  Right now, the last couple of chapters of the Worksman story is a bad dream, or is it a horror show?

No doubt my lucky star is Mark Worksman! My several millions of

15

dollars I'm holding in CD's is because of you, but what a shame to see you struggling (welching) on all of your financial obligations.

My memory is starting to come back to me now.  I think Rand sold $63 million dollars in Power Ranger/Barbie products the year I met you and we worked on a keystone margin but when you went out and screwed the Ross creditors you developed your style which you have become famous for today.

38.   By letter dated October 23, 2009, the Goldmeiers and Century Sports, by their counsel, advised Rand and Mark Worksman that, among other things, the Goldmeiers were accelerating the maturity of the Subordinated Note and all other amounts allegedly owed to them and demanded payment in full of all such indebtedness.

39.   Subsequent to the issuance of the October 23, 2009 letter and prior to the commencement of the State Court Action (defined below), the Goldmeiers acknowledged having multiple meetings with Mark Worksman and others:

Despite over ten (10) meetings with Worksman, his counsel and the consultant (referring to Stephan Pinsly), Rand has not and will not provide a workable solution to the Goldmeiers..."

40.   By Verified Complaint filed on January 20, 2010, the Goldmeiers and Century Sports commenced an action in the Supreme Court of the State of New York, County of Nassau, titled *Allen Goldmeier, Steven Goldmeier and Century Sports, Inc. f/k/a Rand International Leisure Products, Ltd. v. Mark Worksman and Rand International Leisure Products, LLC f/k/a Rand International Acquisition I, LLC, and Meltzer, Lippe, Goldstein & Breitstone, LLP,* Index No. 1315/2010 (the "State Court Action").

41.  By way of the State Court Action, the Goldmeiers and Century Sports sought, among other relief, a temporary restraining order directing the delivery and turnover to Century Sports of Mark Worksman's 100% membership interest in Rand, an order of seizure of the assets of Rand, money judgments against Rand and Mark Worksman and an order precluding Rand

16

and/or Mark Worksman from taking any steps to assign, sell and/or transfer any of the collateral securing the Subordinated Note held by Century Sports.

42.  Allen Goldmeier also asserted that he and his brother had "exhausted their patience" with Mark Worksman.

43.  By Notice of Cross Motion dated January 27, 2010, Rand and Mark Worksman moved to dismiss the State Court Action on the grounds that, among others, the action was premature under the terms of the Subordination Agreement.

44.  In further support of the Cross-Motion, Stephan Pinsly as Managing Director of Getzler, Henrich & Associates (a turnaround firm retained by Rand at the behest of Wells Fargo Bank) submitted a sworn Affidavit wherein he disputed the allegations made by Allen Goldmeier in the State Court Action and alleged, among other things, that:

(a)  the Goldmeiers were involved in the operation of Rand which included their meeting with customers, suppliers and employees;

(b)  the Goldmeiers intentionally excluded Jonathan Cohen from the management team of Rand;

(c)  *Rand was (and is) continuing to operate as a going concern*;

(d)  upon information and belief, Wells Fargo had not been paid in full and had not terminated its UCC financial statements; and

(e)  the Goldmeiers were terminated as employees at Mr. Pinsly's request for cause including their "disruptive influence on the operations" and that the Goldmeiers had created the tenuous situation at Rand by their "continuous manipulation of [Worksman] into numerous untenable positions regarding the growth of revenues and not following through on oral promises to subordinate their security interests".

45.  On February 18, 2010, the Honorable Timothy S. Driscoll of the New York State Supreme Court issued a written decision which held in pertinent part as follows:

The Court denies Plaintiffs' applications for injunctive relief and orders of seizure based, in part, on the Court's conclusion that Plaintiffs have not

demonstrated a likelihood of success on the merits.  In light of the factual disputes regarding numerous issues, including 1) the extent to which the Goldmeiers participated in Rand's daily operations, 2) the quality of the parties' contributions to Rand's daily operations, 3) the extent to which the Goldmeiers and/or Worksman were a causative factor in Rand's difficulties in meeting its financial obligations, 4) the viability of Rand in its current financial condition, and 5) the appropriateness of Rand's decision to terminate the Goldmeiers as employees of Rand, the Court determines that Plaintiffs have not demonstrated a likelihood of success on the merits.

Moreover, in light of the factual disputes regarding the current viability of Rand, Plaintiffs have not met their burden of establishing irreparable harm without injunctive relief.  The Court also concludes that Plaintiffs have not demonstrated that their alleged harm is not compensable by money damages.  In addition, Plaintiffs have not offered proof that Wells Fargo consented to this application for an order of seizure, as the Subordination Agreement appears to require.

Finally, the Court also concludes that Plaintiffs have not demonstrated a balancing of the equities in their favor.  The Court has not been presented with sufficient proof that, as Plaintiffs, submit, Rand will (fail) without the requested injunctive relief and the value of their interest in the Collateral will be greatly compromised. Indeed, it could well be that Plaintiffs have overstated their role in Rand's viability.

In light of the foregoing, the Court 1) denies Plaintiffs' application in its entirety and 2) vacates the TRO.

\* \* \*

The Court concludes that the applicable provisions of the Subordination Agreement may preclude the instant action unless and until Wells Fargo has been fully paid under the applicable loan documents.  The Court, however, cannot determine from the record before it whether full payment has been made to Wells Fargo.  Accordingly, the Court denies Defendants' cross motion, with leave to renew upon a showing, based on documentation provided by a representative of Wells Fargo or another source with personal knowledge of the relevant facts, that Wells Fargo has not been fully repaid in connection with the loans at issue.

All matters not decided herein are hereby denied.

This constitutes the decision and order of the Court.

46.  Justice Driscoll further directed that all "parties appear before the Court on

March 18, 2010 at 9:30 a.m. for a Preliminary Conference.

47.  On February 25, 2010, Rand's counsel in the State Court Action, Zane & Rudofsky, called counsel for the Petitioning Creditors and was advised of an intent to file an Involuntary Petition by Friday, February 26, 2010.

48.  Allen Goldmeier never called a Special Meeting of the Managers of Rand to discuss his intent to proceed with the filing of the Involuntary Petition.

49.  On March 3, 2010, the following two e-mails were exchanged between Allen Goldmeier to Petitioning Creditor Matang Gonzales:

> From:  allengoldmeier@aol.com
> Sent:   Wednesday, March 03, 2010 2:22 PM
> To:     Matang Gonzales; Brian Hufnagel
> Cc:     Steven Goldmeier
> Subject:  Re: Rand
>
> Matt:  Rand has a couple of million in unpaid, unsecured debt obligations to contend with.  Additionally Rand has significant secured payment obligations that are not being honored as well.  By signing the petition your creditors rights will be accelerated although in honesty the opportunity of recovery is minuscule.  Be sure to discuss this with your attorney before signing.
>
> Also, if you would like my attorney to call you to explain, or to speak to your attny, please advise.
>
> Brian; please send Matt the petition for signing in the meantime per info below.
>
> Allen Goldmeier
>
> *   *   *
>
> From:  Matang Gonzales
> To:     Allen Goldmeier
> Cc:     Steven Goldmeier
> Subject:  From Mat Gonzales
> Sent:   Mar 3, 2010 3:21 PM
>
> Hi Allen,
> I spoke with Brian Hufnagel and he said I should ask if you are going to "cover me" if the legal action backfires and Rand comes after me for

damages.

Will you do this for me?

Mat

50.    The "significant secured payment obligations" mentioned in Allen Goldmeier's e-mail refers to the $3,000,000 Subordinated Note in favor of Century Sports/the Goldmeiers.

51.  On March 9, 2010, Executive Importers filed a Petition for Eviction in the Second District Court of Suffolk County against Rand wherein Executive Importers alleged:

> Respondent Rand International Leisure Products, LLC is tenant of the premises, entered into possession under an oral rental agreement made on or about February, 2007 between landlord's predecessor-in-interest wherein respondent promises to pay to landlord as rent $50,000 in advance on (sic) the 1st day of each month.

52.  The total amount sought to be recovered by Executive Importers was $850,000 purportedly representing the rent owed by Rand for the seventeen month period November, 2008 through March, 2010 "with interest thereon from November 2009".

53.  On December 14, 2009, and prior to the filing of the Eviction Petition, Executive Importers issued a Three-Day Notice to Tenant alleging an indebtedness owed to it of

"$700,000 for rent under the rental agreement."

54.  By way of the Involuntary Petition, prepared one day after the filing of the Involuntary Petition, Executive Importers alleged that Rand owed it the sum of $1,161,560.84.

55. Mark Worksman submitted an affidavit sworn to on February 1, 2010 in the State Court Action wherein he stated as follows:

> Another problem caused by the Goldmeiers, and reflecting yet additional bad-faith breaches of promise on their part, was the refusal to reduce the rent due to another Goldmeier entity, Executive Importers Inc. (see Allen

20

Goldmeier Affidavit at note 5).  The Goldmeiers promised after the closing of the Rand acquisition that if I could arrange re-financing of the Building, the rent would be lowered from $50,000 to $35,000.  When I gave the proposal for re-financing to them, the Goldmeiers (literally) tore it up.  This cost the company approximately another $300,000 in rent.  Subsequently, they agreed to reduce the rent to $40,000 per month. (Pl. Ex. 17) Now they have reneged on that agreement as well.

**H.**     The Alleged Debtor has filed a brief (no brief filed by the Petitioning Creditors).

Proposed findings of fact and conclusions of law filed separately.

Dated:  New York, New York
           June 14, 2010

**PICK & ZABICKI LLP**
Counsel to the Alleged Debtor


By:      **/s/  Douglas J. Pick**
           Douglas J. Pick
           369 Lexington Avenue, 12th Floor
           New York, New York 10017

p:\nilda2\wpdocs\rand-int'l\trial\pretrial-memo.doc